1 | CRAIG C. CORBITT (No. 83251)
JUDITH A. ZAHID (No. 215418)
2 | ZELLE, HOFMANN, VOELBEL, MASON &
GETTE LLP
3 | 44 Montgomery Street, Suite 3400
San Francisco, CA 94104
4 | Telephone:    (415) 693-0700
Facsimile:    (415) 693-0770
5 | ccorbitt@zelle.com

6 | Attorneys for Plaintiffs

7 | [Names and Addresses of Additional Counsel on Signature Page]

8

*ORIGINAL FILED*

*E-filing*

JUL 1 3 2005

RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

9 | **IN THE UNITED STATES DISTRICT COURT**

10 | **FOR THE DISTRICT OF NORTHERN DISTRICT OF CALIFORNIA**

11

12 | LAW OFFICES OF LAUREL STANLEY, a
California business entity, and WILLIAM F.
13 | CRONIN, a resident of Texas,

C 05 2858 EDL

14 |              Plaintiffs,

CIVIL ACTION NO. _____

15 | vs.

**CLASS ACTION COMPLAINT**

16 | INTEL CORPORATION, a Delaware
corporation,
17 |              Defendant.

**JURY TRIAL DEMANDED**

18

19 |         Plaintiffs Law Offices of Laurel Stanley, a California business entity, and William

20 | F. Cronin, a resident Texas (collectively "Plaintiffs"), by and through their undersigned

21 | attorneys, and for their class action complaint against Intel Corporation and its worldwide family

22 | of dominated subsidiaries, including Intel Kabushiki Kaisha (collectively "Intel"), aver on

23 | knowledge as to themselves and their own acts and on information and belief as to all other

24 | matters, as follows.

25 |                    **I.    NATURE OF THE ACTION**

26 |         1.    Intel holds a monopoly in a market critical to the nation's economy:

27 | microprocessors that run the Microsoft Windows and Linux families of operating systems (the

28 | "x86 Microprocessor Market"). While Advanced Micro Devices, Inc. and its subsidiary AMD

1   International Sales & Service, Ltd. (collectively "AMD") compete with Intel in this global
2   market, Intel possesses unmistakable and undeniable market power, its microprocessor revenues
3   accounting for approximately 90% of the worldwide total (and 80% of the units).

4       2.      For over a decade Intel has unlawfully maintained its monopoly by engaging in a
5   relentless, worldwide campaign to coerce customers to refrain from dealing with AMD that has
6   resulted in consumers paying higher prices for x86 microprocessors and left them with fewer
7   buying choices for such microprocessors.  Among other things:

8       •       Intel has forced major direct customers into exclusive or near-exclusive deals;
9       •       it has conditioned rebates, allowances and market development funding on direct
10              customers' agreement to severely limit or forego entirely purchases from AMD;
11      •       it has established a system of discriminatory, retroactive, first-dollar rebates
12              triggered by purchases at such high levels as to have the practical and intended
13              effect of denying customers the freedom to purchase any significant volume of
14              processors from AMD;
15      •       it has threatened retaliation against direct customers introducing AMD computer
16              platforms, particularly in strategic market segments;
17      •       it has established and enforced quotas among key retailers effectively requiring
18              them to stock overwhelmingly, if not exclusively, Intel-powered computers,
19              thereby artificially limiting consumer choice;
20      •       it has forced PC makers and technology partners to boycott AMD product
21              launches and promotions; and
22      •       it has abused its market power by forcing on the industry technical standards and
23              products which have as their central purpose the handicapping of AMD in the
24              marketplace.

25      3.      Intel's economic coercion of customers extends to all levels—from large
26  computer-makers like Hewlett-Packard and IBM to small system-builders to wholesale
27  distributors to retailers such as Circuit City.  All must either accept conditions that exclude AMD
28  or suffer discriminatory pricing and competitively crippling treatment.  In this way, Intel has

-2-

1 || avoided competition on the merits and deprived AMD of the opportunity to stake its prices and

2 || quality against Intel's for every potential microprocessor sale,

3 ||      4.     Intel's conduct has become increasingly egregious over the past several years as

4 || AMD has achieved technological leadership in critical aspects of microprocessor architecture. In

5 || April of 2003, AMD introduced its Opteron microprocessor, the first microprocessor to take x86

6 || computing from 32 bits to 64 bits—an advance that allows computer applications to address

7 || exponentially more memory, thereby increasing performance and enabling features not possible

8 || with just 32 bits. Unlike Intel's 64-bit architecture of the time (Itanium), the AMD Opteron—as

9 || well as its subsequently-introduced desktop cousin, the AMD Athlon64—offers backward

10 || compatibility, allowing PC users to continue using 32-bit software as, over time, they upgrade

11 || their hardware. Bested in a technology duel over which it long claimed leadership, Intel

12 || increased exploitation of its market power to pressure customers to refrain from migrating to

13 || AMD's superior, lower-cost microprocessors.

14 ||      5.     Intel's conduct has caused computer manufacturers continue to buy most of their

15 || requirements from Intel, continue to pay monopoly prices, continue to be exposed to Intel's

16 || economic coercion, and continue to submit to artificial limits Intel places on their purchases from

17 || AMD. With AMD's opportunity to compete thus constrained, the cycle continues, and Intel's

18 || monopoly profits continue to flow.

19 ||      6.     Consumers such as plaintiffs ultimately foot this bill, in the form of inflated PC

20 || prices and the loss of freedom to purchase computer products that best fit their needs. Society is

21 || worse off for lack of innovation that only a truly competitive market can drive. The Japanese

22 || Government recognized these competitive harms when on March 8, 2005, its Fair Trade

23 || Commission (the "JFTC") recommended that Intel be sanctioned for its exclusionary misconduct

24 || directed at AMD. Intel chose not to contest the charges. *See* <http://www.jfte.go.jp/e-

25 || page/pressreleases/2005/march/050308intel.pdf>. The European Commission has also recently

26 || stepped up its investigation of Intel's marketing practices. *See*

27 || <http://news.com/EU+revisits+Intel+probe/2100-7341_3-5228652.html?tag=nl>. On July 12,

28 || 2005, it was confirmed that the Commission had conducted raids against Intel in Europe.

-3-

1    7.    Recently, AMD has struck back by filing antitrust actions against Intel. On June

2   27, 2005, it filed an antitrust action against Intel in the United States District Court for the

3   District of Delaware, revealing to the public for the first time many of Intel's unlawful practices.

4   Many of the allegations in this Complaint are based on those revelations. On June 30, 2005,

5   AMD also filed two antitrust suits in Japan against Intel Kabushiki Kaisha.

6                                 **II.    JURISDICTION AND VENUE**

7    8.    The Court has subject matter jurisdiction under 28 U.S.C. §1337 (commerce and

8   antitrust regulation) and 28 U.S.C. §1331 (federal question), as this action arises under Section 2

9   of the Sherman Act (15 U.S.C. §2) and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§15(a)

10   and 26). The Court has supplemental subject matter jurisdiction of the pendent state law claims

11   under 28 U.S.C. §1367.

12    9.    Venue is proper because Intel resides and is found in this district within the

13   contemplation of 28 U.S.C. §1391(b) and (c) and as provided in Sections 4 and 12 of the Clayton

14   Act (15 U.S.C. §§15 and 22).

15                                 **III.    THE PARTIES**

16    10.    The Law Offices of Laurel Stanley is a California business entity, and William F.

17   Cronin is a resident of Texas. Both plaintiffs indirectly purchased within the last four years x86

18   microprocessors manufactured by Intel.

19    11.    Defendant Intel Corporation is a Delaware corporation with its principal executive

20   offices at Santa Clara, California, and it conducts business both directly and through wholly-

21   owned and dominated subsidiaries worldwide. Intel and its subsidiaries design, produce, and sell

22   a wide variety of microprocessors, flash memory devices, and silicon-based products for use in

23   the computer and communications industries worldwide.

24                                 **IV.    CLASS ACTION ALLEGATIONS**

25    12.    Plaintiffs bring this suit as a class action pursuant to Rules 23(b)(2) and 23(b)(3)

26   of the Federal Rules of Civil Procedure, on behalf of themselves and a Plaintiff Class (the

27   "Class") composed of and defined as follows:

28

-4-

CLASS ACTION COMPLAINT

1    All persons and entities residing in the United States who, during
     the last four years, purchased an x86 microprocessor in the United
2    States indirectly from the Intel. Specifically excluded from this
     Class are Intel; the officers, directors or employees of Intel; any
3    entity in which Intel has a controlling interest; and any affiliate,
     legal representative, heir or assign of Intel. Also excluded are any
4    federal, state or local governmental entities, any judicial officer
     presiding over this action and the members of his/her immediate
5    family and judicial staff, and any juror assigned to this action

6        13.    This action has been brought and may be properly maintained as a class action

7    pursuant to Rule 23 of the Federal Rules of Civil Procedure for the following reasons:

8            a.    The Class is ascertainable and there is a well-defined community of

9                  interest among the members of the Class;

10           b.    Based upon the nature of the trade and commerce involved and the number

11                 of indirect purchasers of x86 microprocessors, plaintiffs believe that the

12                 members of the Class number in the thousands, and therefore is

13                 sufficiently numerous that joinder of all Class members is not practicable;

14           c.    Plaintiffs' claims are typical of the claims of the members of the Class

15                 because plaintiffs indirectly purchased x86 microprocessors from Intel or

16                 its co-conspirators, and therefore plaintiffs' claims arise from the same

17                 common course of conduct giving rise to the claims of the members of the

18                 Class and the relief sought is common to the Class;

19           d.    The following common questions of law or fact, among others, exist as to

20                 the members of the Class:

21                 i.    whether Intel unlawfully monopolized and conspired to

22                       monopolize the x86 Microprocessor Market;

23                 ii.   whether Intel's conduct caused x86 microprocessor prices to be

24                       higher than they would have been in the absence of such conduct;

25                 iii.  the operative time period of Intel's unlawful conduct;

26

27

28

-5-
CLASS ACTION COMPLAINT

| | | |
|---|---|---|
| 1 | iv. | whether Intel's conduct caused injury to the business or property of |
| 2 | | Plaintiffs and the members of the Class; |
| 3 | v. | the appropriate measure of the amount of damages suffered by the |
| 4 | | Class; |
| 5 | vi. | whether Intel's conduct violates Section 2 of the Sherman Act; |
| 6 | vii. | whether Intel's conduct violates Sections 16720 and 17200 of the |
| 7 | | California Business and Professions Code and the California |
| 8 | | common law dealing with the tort of monopolization; |
| 9 | viii. | whether Intel's conduct violates the antitrust, unfair competition |
| 10 | | and consumer protection laws of the other states as alleged below; |
| 11 | ix. | the appropriate nature of class-wide equitable relief. |
| 12 | e. | These and other questions of law or fact which are common to the |
| 13 | | members of the Class predominate over any questions affecting only |
| 14 | | individual members of the Class; |
| 15 | f. | After determination of the predominate common issues identified above, if |
| 16 | | necessary or appropriate, the Class can be divided into logical and |
| 17 | | manageable subclasses; |
| 18 | g. | Plaintiffs will fairly and adequately protect the interests of the Class in that |
| 19 | | Plaintiffs have no interests that are antagonistic to other members of the |
| 20 | | Class and have retained counsel competent and experienced in the |
| 21 | | prosecution of class actions and antitrust litigation to represent themselves |
| 22 | | and the Class; |
| 23 | h. | A class action is superior to other available methods for the fair and |
| 24 | | efficient adjudication of this litigation since individual joinder of all |
| 25 | | damaged Class members is impractical.  The damages suffered by |
| 26 | | individual Class members are relatively small, given the expense and |
| 27 | | burden of individual prosecution of the claims asserted in this litigation. |
| 28 | | Thus, absent the availability of class action procedures, it would not be |

CLASS ACTION COMPLAINT

feasible for Class members to redress the wrongs done to them. Even if the Class members could afford individual litigation, the court system could not. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system. Therefore, the class action device presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale and comprehensive supervision by a single court;

i.     Intel has acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole; and

j.     In the absence of a class action, Intel would be unjustly enriched because they would be able to retain the benefits and fruits of their wrongful conduct.

14.     The Claims in this case are also properly certifiable under the laws of the State of California, and of the other individual states identified below in the Fifth and Sixth Claims for Relief.

## V.     INITIAL FACTUAL BACKGROUND

### A.     Early History

15.     The brain of every computer is a general-purpose microprocessor, an integrated circuit capable of executing a menu of instructions and performing requested mathematical computations at very high speed. Microprocessors are defined by the ir instruction set—the repertoire of machine language instructions that a computer can follow. So, too, are computer operating systems—software programs that perform the instructions in the set allowing the computer to perform meaningful tasks. The first generation of microprocessors, which were capable of handling 4 and then later 8 bits of data simultaneously, evolved to provide 16-bit capability (the original DOS processors), then sometime later a 32-bit capability (allowing the

1  use of advanced graphical interfaces such as later versions of Windows), and now 64-bit

2  capability.

3          16.    When IBM defined the original PC standards in the early 1980s, it had available to

4  it a variety of microprocessors, each with its own instruction set—among these were

5  microprocessors developed by Motorola, Zilog, National Semiconductor, Fairchild, Intel and

6  AMD. IBM opted for the Intel architecture, which utilized what became known as the x86

7  instruction set (after Intel's naming convention for its processors, i.e., 8086, 80186, 80286,

8  80386), and a compatible operating system offered by Microsoft, known as DOS. Unwilling to

9  be consigned to a single source of supply, however, IBM demanded that Intel contract with

10 another integrated circuit company and license it to manufacture x86 chips as a second source.

11 AMD, which had worked with Intel before in supplying microprocessors, agreed to abandon its

12 own, competing architecture, and it undertook to manufacture x86 chips as a second source of

13 supply. Assured that it would not be dependent upon a monopoly supplier of x86 chips, IBM

14 introduced the PC in August 1981—and its sales exploded.

15         17.    Although, as discussed below, an arbitrator later found that "AMD's sponsorship

16 helped propel Intel from the chorus line of semiconductor companies into instant stardom," Intel

17 soon set out to torpedo the 1982 AMD-Intel Technology Exchange Agreement (the

18 "Agreement") by which each would serve as a second source for products developed by the

19 other. For example, Intel was required by the Agreement to send AMD timely updates of its

20 second generation 80286 chip. Instead, in a "deliberate[]" effort "to shackle AMD progress,"

21 Intel sent AMD information "deliberately incomplete, deliberately indecipherable and

22 deliberately unusable by AMD engineers." The conduct was, in the arbitrator's words,

23 "inexcusable and unworthy." And it was not isolated. Intel elsewhere tried to "sabotage" AMD

24 products, engaged in "corporate extortion" and demonstrated a near-malevolent determination "to

25 use all of its economic force and power on a smaller competitor to have its way."

26         18.    In another underhanded effort to stifle AMD's business, Intel decided in 1984

27 that, the agreement between the parties notwithstanding, Intel would become the sole-source for

28 the promising 80386 chip. To fully realize its objective, Intel engaged in an elaborate and

-8-

1  insidious scheme to mislead AMD (and the public) into erroneously believing that AMD would

2  be a second source, thereby keeping AMD in the Intel "competitive camp" for years. This

3  duplicitous strategy served a broader purpose than simply preventing AMD from competing with

4  Intel. Customers' perception that AMD would continue to serve as Intel's authorized second

5  source was essential to Intel's aim of entrenching the x86 family of microprocessors as the

6  industry standard (as it had been essential to IBM's original introduction of the PC). Intel was

7  well aware that if computer manufacturers knew Intel intended to sole source its 32-bit product,

8  they would be motivated to select alternative products produced by companies offering second

9  sources. Intel could not preserve the appearance that AMD would second source the 386 if it

10 terminated the contract or otherwise disclosed its actual intent. Thus, Intel stalled negotiations

11 over product exchanges, while at the same time allowing AMD to believe that it could ultimately

12 obtain the 386. This injured competition by deterring and impeding serious competitive

13 challenges to Intel and directly injured AMD by depriving it of the revenues and profits it would

14 have earned from such a challenge.

15       19.    Intel implemented this secret plan for the purpose of acquiring and maintaining an

16 illegal monopoly in the x86 line of microprocessors, which it did by at least 1987. As was its

17 plan, Intel's conduct drained AMD's resources, delayed AMD's ability to reverse-engineer or

18 otherwise develop and manufacture competitive products, and deterred AMD from pursuing

19 relationships with other firms. In so doing, Intel wrongfully secured the benefit of AMD's

20 marketing skills and talent in support of the x86 line of microprocessors and related peripherals

21 and secured the benefit of substantial competitively sensitive AMD information regarding its

22 product development plans. When AMD petitioned to compel arbitration in 1987 for Intel's

23 breach and bad faith, the arbitrator took notice of Intel's anticompetitive design: "In fact, it is no

24 fantasy that Intel wanted to blunt AMD's effectiveness in the microprocessor marketplace, to

25 effectively remove AMD as a competitor."

26       20.    In 1992, after five years of litigation, the arbitrator awarded AMD more than $10

27 million plus prejudgment interest and a permanent, nonexclusive and royalty-free license to any

28 Intel intellectual property embodied in AMD's own 386 microprocessor, including the x86

instruction set. Confirmation of the award was upheld by the California Supreme Court two

years later. *Advanced Micro Devices, Inc. v. Intel Corp.*, 9 Cal. 4th 462, 885 P.2d 994, 36 Cal.

Rptr. 2d 581 (1994).

**B.      AMD Moves from Second Source to Innovator.**

21.      Shortly after confirmation of the award, AMD settled its outstanding disputes with

Intel in a 1995 agreement which gave AMD a shared interest in the x86 instruction set but

required it to develop its own architecture to implement those instructions. The settlement had

the unintended benefit of forcing AMD to reinvent itself. Beginning in the late 1990s, AMD

committed its resources to innovating not just to be different, but to deliver solutions of greatest

benefit to its customers. AMD's first x86 chip without Intel pin-compatibility, the Athlon

microprocessor delivered in 1999, marked the first (but not last) time AMD was to leapfrog Intel

technologically and beat it to market with a new generation Windows microprocessor (and break

the 1GHz speed barrier to boot).

22.      AMD's biggest breakthrough came four years later when it introduced an

extension of x86 architecture that took Windows processors into the realm of 64-bit computing.

Unlike Intel, which invested billions in its Itanium microprocessor and a new, uniquely 64-bit

proprietary instruction set (which, because it was proprietary, would have been a game-ending

development for AMD had it become the industry standard), AMD undertook to supplement the

x86 instructions to accommodate 64-bit processing while allowing 32-bit software to be run as

well. AMD's efforts culminated when, in April of 2003, it brought to market its Opteron

microprocessor for servers (the workhorse computers used by businesses to run corporate

networks, e-commerce websites and other high-end, computationally-intense applications).

Opteron was the industry's first x86 backward compatible 64-bit chip. Six months later, AMD

launched the Athlon64, a backward compatible 64-bit microprocessor for desktops and mobile

computers.

23.      The computing industry hailed AMD's introduction of 64-bit computing as an

engineering triumph. *InfoWorld* in its August 27, 2004 issue stated:

> You just gotta love a Cinderella story, ... AMD's rapid rise from
> startup to $5 billion semiconductor powerhouse is, as Humphrey

-10-

CLASS ACTION COMPLAINT.

> Bogart's English teacher once said, the stuff of which dreams are made. ... In the process, AMD has become known as the company that kept Intel honest, the Linux of the semiconductor world. ... After decades of aging Intel architecture, the AMD64 architecture, rooted in Opteron and Athlon 64 processors, has actually been imitated by Intel in the form of Nocona, Intel's 64-bit version of Xeon. In a stunning reversal of fortune, Intel was forced to build that chip because Opteron was invading a server market that the Intel Itanium was supposed to dominate.
>
> (<http://www.infoworld.com/article/04/08/27/35FРand_1.html?s=feature>.)

Microsoft endorsed AMD's 64-bit instruction set and announced that Windows would support it. As noted by *Infoworld*, Intel then copied AMD's technology for its own 64-bit offerings—an event that poignantly marked AMD's technological emergence.

24. AMD has since extended its AMD64 technology to the balance of AMD's microprocessor line-up (which now includes AMD Athlon 64, AMD Athlon 64 FX, Mobile AMD Athlon 64, AMD Sempron, and AMD Turion64 products). Owing also to AMD's pioneering developments in dual-core processors and its introduction of an improved architecture that speeds up microprocessor communications with memory and input/output devices, AMD has seized technological leadership in the microprocessor industry. Its innovation has won for it over 70 technology leadership and industry awards and, in April 2005, the achievement of being named "Processor Company of 2005" at, to Intel's embarrassment, an Intel-sponsored industry awards show.

25. AMD's market share has not kept pace with its technical leadership. Intel's misconduct is the reason. Intel has unlawfully maintained the monopoly IBM bestowed on it and systematically excluded AMD from any meaningful opportunity to compete for market share by preventing the companies that buy chips and build computers from freely deploying AMD processors; by relegating AMD to the low-end of the market; by preventing AMD from achieving the minimum scale necessary to become a full-fledged, competitive alternative to Intel; and by erecting impediments to AMD's ability to increase its productive capacity for the next generation of AMD's state of the art microprocessors.

-11-

CLASS ACTION COMPLAINT

# VI.    THE x86 PROCESSOR INDUSTRY

## A.    Competitive Landscape

26.    The x86 versions of Windows and Linux, the two operating systems that dominate the business and consumer computer worlds, have spawned a huge installed base of Windows- and Linux-compatible application programs that can only run the x86 instruction set. This has given Intel effective ownership of personal computing. Although other microprocessors are offered for sale, the non-x86 microprocessors are not reasonably interchangeable with x86 microprocessors because none can run the x86 Windows or Linux operating systems or the application software written for them.

27.    The relevant product market is x86 microprocessors because a putative monopolist in this market would be able to raise the prices of x86 microprocessors above a competitive level without losing so many customers to other microprocessors as to make this increase unprofitable. While existing end-users can theoretically shift to other operating system platforms, high switching costs associated with replacing existing hardware and software make this impractical. Further, the number of new, first-time users who could choose a different operating-system platform is too small to prevent an x86 microprocessor monopolist from imposing a meaningful price increase for a non-transitory period of time. Computer manufacturers would also encounter high switching costs in moving from x86 processors to other architectures, and no major computer maker has ever done it. In short, demand is not cross-elastic between x86 microprocessors and other microprocessors at the competitive level.

28.    The relevant geographic market for x86 microprocessors is worldwide. A relevant geographic submarket is the United States. A worldwide geographic market is appropriate because Intel and AMD compete globally; PC platform architecture is the same from country to country; microprocessors can be easily and inexpensively shipped around the world, and frequently are; and the potential for arbitrage prevents chipmakers from pricing processors differently in one country than another. A geographic submarket consisting of the United States is appropriate, as well.

29.    Intel dominates the worldwide x86 Microprocessor Market. According to

1  published reports, over the past several years it has consistently achieved more than a 90%

2  market share as measured by revenue, while AMD's revenue share has remained at

3  approximately 9%, with all other microprocessor manufacturers relegated to less than 1%. Intel

4  has captured at least 80% of x86 microprocessor unit sales in seven of the last eight years. Since

5  1999, AMD's worldwide volume share has hovered at 15%, only once penetrating barely the

6  20% level. The following chart is illustrative:

7  **x86 Worldwide CPU Unit Market Share**

|        | 1997  | 1998  | 1999  | 2000  | 2001  | 2002  | 2003  | 2004  |
|--------|-------|-------|-------|-------|-------|-------|-------|-------|
| Intel  | 85.0% | 80.3% | 82.2% | 82.2% | 78.7% | 83.6% | 82.8% | 82.5% |
| AMD    | 7.3%  | 11.9% | 13.6% | 16.7% | 20.2% | 14.9% | 15.5% | 15.8% |
| Others | 7.5%  | 7.9%  | 4.2%  | 1.1%  | 1.1%  | 1.4%  | 1.7%  | 1.7%  |

30.    Intel's x86 family of microprocessors no longer faces any meaningful competition other than from AMD. National Semiconductor acquired Cyrix in 1997 but shuttered it less than two years later. At the beginning of this year only two other x86 chip makers remained, Via Technologies, Inc. and Transmeta Corporation—which together account for less than 2% of the market. Transmeta has since announced its intention to cease selling x86 microprocessors, and Via faces dim prospects of growing its market share to a sustaining level.

31.    Intel is shielded from new competition by huge barriers to entry. A chip fabrication plant ("fab") capable of effieiently mass-producing x86 microprocessors carries a price tag of at least $2.5 to $3.0 billion. In addition, any new entrant would need the financial wherewithal to underwrite the billions more in research and development costs to design a competing x86 microprocessor and to overcome almost insurmountable IP and knowledge barriers.

**B.    Customers for x86 microprocessors**

32.    Annual worldwide consumption of x86 microprocessors currently stands at just over 200 million units per year and is expected to grow by 50% over the remainder of the decade. Relatively few microprocessors are sold for server and workstation applications (8.75 million in

-13-

CLASS ACTION COMPLAINT

1    2004), but these command the highest prices. Most x86 microprocessors are used in desktop PCs

2    and mobile PCs, with desktops currently outnumbering mobile by a margin of three to one. Of

3    the total worldwide production of computers powered by x86 microprocessors, 32% are sold to

4    U.S. consumers; U.S. sales of AMD-powered computers account for 29% of AMD's production.

5            33.    The majority of x86 microprocessors are sold to a handful of large OEMs (original

6    equipment manufacturers), highly visible companies recognized throughout the world as the

7    leading computer makers. Regarded by the industry as "Tier One" OEMs over most product

8    categories are: Hewlett-Packard ("HP"), which now also owns Compaq Computer ("Compaq");

9    Dell, Inc. ("Dell"); IBM, which as of May 1, 2005, sold its PC (but not server) business to

10   Lenovo; Gateway/eMachines; and Fujitsu/Fujitsu Siemens ("Fujitsu"), the latter a Europe-based

11   joint venture. Toshiba, Acer, NEC and Sony are also commonly viewed as Tier One OEMs in

12   the notebook segment of the PC market. HP and Dell are the dominant players, collectively

13   accounting for over 30% of worldwide desktop and mobile sales, and almost 60% of worldwide

14   server sales. Both are U.S.-based companies, as are IBM and Gateway/eMachines; and all but

15   Gateway have U.S. manufacturing operations (as does Sony, which operates a North American

16   production facility in San Diego).

17           34.    Worldwide, the Tier One OEMs collectively account for almost 80% of servers

18   and workstations (specialty high-powered desktops), more than 40% of worldwide desktop PCs,

19   and over 80% of worldwide mobile PCs. According to industry publications, unit market share

20   in 2004 among the Tier One OEMs were as follows:

21

22

23

24

25

26

27

28

-14-

CLASS ACTION COMPLAINT

**OEM Market Shares—2004**
**Company Server/WS Desktop Mobile**

| Company | Server/WS | Desktop | Mobile |
|---|---|---|---|
| Hewlett-Packard | 29.86% | 13.69% | 16.23% |
| Dell | 28.34% | 16.18% | 17.27% |
| IBM/Lenovo | 14.46% | 3.69% | 9.20% |
| Fujitsu/Siemens | 3.70% | 2.83% | 6.88% |
| Acer | 0.81% | 1.85% | 8.53% |
| Toshiba | 0.31% | 0.05% | 12.73% |
| NEC | 2.06 | 2.02% | 4.50% |
| Sony | -- | 0.76% | 4.23% |
| Gateway/eMachines | 0.16% | 2.48% | 1.45% |
| Total | 79.70% | 43.55% | 81.02% |

35.    The balance of x86 production is sold to smaller system builders and to independent distributors. The latter, in turn, sell to smaller OEMs, regional computer assemblers, value-added resellers and other, smaller distributors. Currently, distributors account for over half of AMD's sales.

36.    OEMs have adopted a variety of business models, including sales directly to customers through web-based e-commerce, sales through company-employed sales staffs (who target IT professionals and Fortune 1000 companies) and sales through a network of independent distributors (who focus on smaller business customers). With the exception of Dell, which markets to consumers only directly (mostly over the internet), most OEMs also sell through retail chains. Intel and AMD compete not only to have OEMs incorporate their microprocessors into their retail platforms but also to convince retailers to allocate shelf-space so that the platforms containing their respective microprocessors can be purchased in the retailers' stores.

37.    Through its economic muscle and relentless marketing—principally its "*Intel Inside*" and "*Centrino*" programs which financially reward OEMs for branding their PCs as Intel machines—Intel has transformed the OEM world. While once innovative companies themselves, the OEMs have largely become undifferentiated distributors of the Intel platform, offering "*Intel Inside*" and "*Centrino*" computers largely indistinguishable from those of their rivals. As their products have become commoditized, the Tier One OEMs operate on small or negative margins,

1  and, as shown in the following chart, the overwhelming portion of PC profit flows to Intel.

2

3                    **Operating Margins 2001-04—Intel vs. OEMs**



12         38.    This profit drain has left OEMs and others in the distribution chain in a quarter-to-

13  quarter struggle to eke out even a modest return on their assets, thereby making them continually

14  susceptible to Intel's economic coercion, which is described next.

15              **VII.    INTEL'S UNLAWFUL PRACTICES**

16         39.    Intel has maintained its x86 microprocessor monopoly by deploying a host of

17  financial and other exclusionary business strategies that in effect limit its customers' ability

18  and/or incentive to deal with AMD. Although differing from customer to customer and segment

19  to segment, the Intel arsenal includes direct payments in return for exclusivity and near-

20  exclusivity; discriminatory rebates, discounts and subsidies conditioned on customer "loyalty"

21  that have the practical and intended effect of creating exclusive or near-exclusive dealing

22  arrangements; threats of economic retaliation against those who give, or even contemplate

23  giving, too much of their business to AMD, or who refuse to limit their AMD business to Intel-

24  approved models, brands, lines and/or sectors, or who cooperate too closely with AMD's

25  promotion of its competitive processors; and misuse of industry standards-setting processes so as

26  to disadvantage AMD products in the marketplace. As a result of these practices, consumers pay

27  inflated prices for x86 microprocessors and equipment containing them, and have fewer

28  competitor choices for such microprocessors.

-16-

CLASS ACTION COMPLAINT

1    40.    Intel's misconduct is global. It has targeted both U.S. and offshore customers at

2 all levels to prevent AMD from building market share anywhere, with the goal of keeping AMD

3 small and keeping Intel's customers dependent on Intel for very substantial amounts of product.

4 In this way, OEMs remain vulnerable to continual threats of Intel retaliation, AMD remains

5 capacity-constrained, the OEMs remain Intel-dependent, and Intel thereby perpetuates its

6 economic hold over them, allowing it to continue to demand that customers curtail their dealings

7 with AMD. And the cycle repeats itself: by unlawfully exploiting its existing market share, Intel

8 is impeding competitive growth of AMD, thereby laying foundation for the next round of

9 foreclosing actions with the effect that AMD's ability to benefit from its current technological

10 advances is curtailed to the harm of potential customers and consumers.

11    41.    The following is not intended as an exhaustive catalog of Intel's misconduct, or a

12 complete list of its unlawful acts, but only as examples of the types of improper exclusionary

13 practices that Intel has employed.

14 **A.    Practices Directed At OEMs.**

15        **1.    Exclusive and Near-Exclusive Deals.**

16    42.    **Dell.** In its history, Dell has not purchased a single AMD x86 microprocessor

17 despite acknowledging Intel shortcomings and customer clamor for AMD solutions, principally

18 in the server sector. As Dell's President and CEO, Kevin Rollins, said publicly last February:

19           Whenever one of our partners slips on either the economics or
           technology, that causes us great concern. ... For a while, Intel
20           admittedly slipped technologically and AMD had made a step
           forward. We were seeing that in customer response and requests.
21           (<http://www.findarticles.com/p/articles/mi_zdext/is_200502/
           ai_nl02988977>.)
22
       43.    Nonetheless, Dell has been and remains Intel-exclusive. According to industry
23
reports, Intel has bought Dell's exclusivity with outright payments and favorable discriminatory
24
pricing and service. In discussions about buying from AMD, Dell executives have frankly
25
conceded that they must financially account for Intel retribution in negotiating pricing from
26
AMD.
27
       44.    **Sony.** With the introduction of its Athlon microprocessor in 1999, AMD began to
28
make notable inroads into Intel's sales to major Japanese OEMs, which export PCs

-17-

1    internationally including into the U.S. By the end of 2002, AMD had achieved an overall

2    Japanese unit market share of approximately 22%. To reverse the erosion of its business, in 2003

3    Intel paid Sony multimillion dollar sums, disguised as discounts and promotional support, in

4    exchange for absolute microprocessor exclusivity. Sony abruptly cancelled an AMD Mobile

5    Athlon notebook model. Soon thereafter, it cancelled plans to release AMD Athlon desktop and

6    notebook computers. As a result, AMD's share of Sony's business dropped from 23% in 2002 to

7    8% in 2003, and then to 0%, where it remains today. In proceedings brought by the JFTC, Intel

8    has accepted the JFTC charges of misconduct with respect to Sony.

9      45.    **Toshiba.** Like Sony, Toshiba was once a significant AMD customer, but also like

10    Sony, Toshiba received a very substantial payment from Intel in 2001 not to use AMD

11    processors. Toshiba thereupon dropped AMD. Its executives agreed that Intel's financial

12    inducements amounted to "cocaine," but said they were hooked because reengaging with AMD

13    would jeopardize Intel market development funds estimated to be worth $25-30 million per

14    quarter. Toshiba made clear to AMD that the tens of millions of dollars of additional marketing

15    support was provided on the explicit condition that Toshiba could not use AMD microprocessors.

16    In proceedings brought by the JFTC, Intel has accepted the JFTC charges of misconduct with

17    respect to Toshiba.

18      46.    **NEC.** AMD also enjoyed early success with NEC, capturing nearly 40% of its

19    microprocessor purchases for notebooks and desktops in the first quarter of 2002. In May 2002,

20    Intel agreed to pay NEC more than 300 million yen per quarter in exchange for caps on NEC's

21    purchases from AMD. The caps assured Intel at least 90% of NEC's business in Japan, and they

22    established an overall worldwide quota on NEC's AMD dealings. The impact was immediate.

23    While AMD had maintained an 84% share of NEC's Japanese consumer desktop business in the

24    third quarter of 2002, after the payments, AMD's share quickly plummeted to virtually zero in

25    the first quarter of 2003. NEC has made clear to AMD that its Japanese share must stay in the

26    single digits pursuant to NEC's agreement with Intel. Worldwide, AMD's share dipped from

27    nearly 40% to around 15%, where it stands today. In proceedings brought by the JFTC, Intel has

28    accepted the JFTC charges of misconduct with respect to NEC.

-18-

1    47.    **Fujitsu.** In the summer of 2002, Fujitsu informed AMD that Intel had pressured

2  Fujitsu to remove Fujitsu's AMD-powered desktop models from Fujitsu's website. Fujitsu

3  complied by making any potential AMD-buyer click past Intel products to get to the AMD

4  offerings. Then, in early 2003, Intel moved to lock up an even greater share of Fujitsu's

5  business. Intel offered an undisclosed package of financial incentives in return for Fujitsu's

6  agreement to restrict it s dealings with AMD. Fujitsu's catalog currently limits AMD to a single

7  notebook product. In proceedings brought by the JFTC, Intel has accepted the JFTC charges of

8  misconduct with respect to Fujitsu.

9    48.    **Hitachi.** According to the JFTC, Intel has also purchased an exclusive-dealing

10  arrangement with Hitachi, which had been a substantial AMD customer. The agreement caused

11  AMD's Hitachi business to fall precipitously. For example, during the first part of 2002, AMD

12  was shipping 50,000 Athlon microprocessors to Hitachi per quarter. But by the middle of the

13  year, AMD sold no microprocessors to Hitachi at all. In proceedings brought by the JFTC, Intel

14  has accepted the JFTC charges of misconduct with respect to Hitachi.

15    49.    **Gateway/eMachines.** From 2001 to 2004, Gateway was exclusively Intel. In

16  2001, former Gateway CEO Ted Waitt explained to an AMD executive that Intel offered him

17  large sums not to deal with AMD, which he could not refuse: "I have to find a way back to

18  profitability. If by dropping you, I become profitable, that is what I will do." Shortly thereafter,

19  Gateway stopped purchasing from AMD and issued a press release announcing its Intel

20  exclusivity. The announcement came within weeks of similar public announcements of Intel

21  exclusivity by both IBM and Micron.

22    50.    **Supermicro.** Intel's exclusive dealing also extends to small, specialty OEMs of

23  which Supermicro is a good example. Supermicro, the preeminent system assembler for servers

24  and other high-end computers, historically has followed the Dell strategy of never buying from

25  AMD. This arrangement foreclosed AMD from a large part of the approximately one fifth of the

26  server sector not controlled by the Tier One OEMs. Following two years of negotiation,

27  Supermicro finally agreed last year to begin developing an Opteron-powered server; however, it

28  so feared Intel retaliation that it secretly moved the AMD development to quarters behind

-19-
CLASS ACTION COMPLAINT

1    Supermicro's main manufacturing facility. Further, it forbade AMD from publicizing the

2    product or beginning any marketing prior to its actual release. When, in April 2005, Supermicro

3    finally broke away from years of Intel exclusivity, it restricted distribution of its newly-released

4    Opteron-powered product to only sixty of its customers and promoted them with a glossy,

5    upscale brochure devoid of its name and labeled "secret and confidential.".

6        **2.    Product-Line, Channel or Geographic Restrictions.**

7        51.    Intel has also bought more limited exclusivity from OEMs in order to exclude

8    AMD from the most profitable lines or from channels of distribution best tailored to take

9    advantage of AMD's price/performance advantage over Intel. In exchange for discriminatory

10    discounts, subsidies or payments, for example, Intel has largely foreclosed AMD from the

11    lucrative commercial desktop sector. Intel has focused on the major OEMs because, when IT

12    executives from Fortune 1000 companies purchase desktop computers, they look for a strong

13    brand on the box—Dell, IBM or HP. Knowing this, Intel has relentlessly fought to block the

14    introduction of an AMD-powered commercial desktop by the major OEMs who have not ceded

15    total exclusivity to Intel. What follows, again, are only representative examples of Intel

16    misconduct.

17        52.    **HP.** In 2002, when AMD set out to earn a place in HP's commercial desktop

18    product roadmap, HP demanded a $25 million quarterly fund to compensate it for Intel's

19    expected retaliation. Eager to break into the commercial market, and to earn a place in HP's

20    successful "Evo" product line, AMD agreed instead to provide HP with the first million

21    microprocessors for free in an effort to overcome Intel's financial hold over HP. On the eve of

22    the launch, HP disclosed its plan to Intel, which told HP it considered AMD's entry into HP's

23    commercial line a "Richter 10" event. It immediately pressured HP into (1) withdrawing the

24    AMD offering from its premier "Evo" brand and (2) withholding the AMD-powered computer

25    from HP's network of independent value-added resellers, the HP's principal point of access to

26    small business users for whom the computer was designed in the first place. Intel went so far as

27    to pressure HP's senior management to consider firing the HP executive who spearheaded the

28    AMD commercial desktop proposal. As a result of Intel's coercion, the HP-AMD desktop

1    offering was dead on arrival. HP ended up taking only 160,000 of the million microprocessors

2    AMD offered for free. As of today, HP's AMD-equipped commercial desktops remain channel-

3    restricted, and AMD's share of this business remains insignificant.

4    53.    Intel also purchased HP's exclusivity for its most popular notebook line. HP

5    captured 15% of the U.S. retail market last Christmas with an Intel-powered 14.1" display

6    notebook (the "DV 1000") with a popular power saving feature called Quick Play. When AMD

7    sought to convince HP to carry a similar AMD-powered notebook, HP declined. It explained that

8    Intel had paid between $3 and $4 million to lock up this product line for at least one year.

9    54.    **Gateway.** After Gateway's 2004 merger with eMachines, AMD attempted to

10   revive the relationship it had enjoyed with Gateway until 2001, but experienced extremely

11   limited success. While Gateway built one AMD-powered desktop model at the request of Circuit

12   City, AMD remains locked out entirely of Gateway's direct internet sales, its commercial

13   offerings and its server line. According to Gateway executives, their Company has paid a high

14   price for even its limited AMD dealings. They claim that Intel has beaten them into "guacamole"

15   in retaliation.

16   55.    **IBM.** AMD and IBM began negotiations in August 2000 over a proposed

17   commercial PC business partnership. After seven months and with a deal nearing completion,

18   Intel approached IBM with an incentive-based program under which Intel would become IBM's

19   "preferred supplier" for processors in commercial products. "Preferred" meant exclusive. IBM

20   accepted Intel's proposal and terminated discussions with AMD. In return for that exclusivity,

21   according to IBM executive Ed Thum, Intel paid IBM "millions of dollars in market development

22   funds."

23   56.    Intel also acted to thwart AMD efforts to partner with IBM on servers. Although

24   IBM joined AMD as a launch partner when it introduced its Opteron 64-bit server chip in April

25   2003—signaling to the industry and IT professionals its confidence in the product—Intel soon

26   dissuaded IBM from aggressively marketing Opteron servers. After investing heavily in its

27   design, IBM consigned its one Opteron computer model to a single target market segment (High

28   Performance and Technical Computing). This was done, according to an industry report

-21-
CLASS ACTION COMPLAINT

1    (confirmed by an IBM executive), because Intel paid IBM to shelve any further Opteron

2    development. IBM also took Intel money in 2004 to scrap plans for a multiple-microprocessor

3    Opteron server it had already designed and previewed with customers.

4         57.    Intel has also purchased IBM exclusivity in its "ThinkCentre" line of commercial

5    desktops. When AMD pressed IBM to add an Athlon 64 model to its "ThinkCentre" roadmap,

6    IBM executives explained that the move would cost them important Intel subsidies, and they

7    declined.

8         58.    **Fujitsu.** In 2002, Fujitsu and AMD formed an alliance to develop a low-power

9    commercial notebook (FMV Lifebook MG Series) scheduled to go to market in the first quarter

10   of 2003, which AMD spent over 20 million yen designing. Shortly before the launch, Fujitsu

11   told AMD that Intel would not allow it to launch an AMD-powered commercial notebook, and

12   the project died. To this day, AMD remains locked out of Fujitsu's commercial notebook lines.

13   Intel's exclusionary conduct with Fujitsu extends beyond commercial notebooks. In the

14   consumer space, for example, Intel purchased total exclusivity for Fujitsu's FM-Biblo NB

15   consumer notebook line. When AMD tried to break Intel's lock on Fujitsu notebooks by offering

16   to match any Intel discount, Fujitsu made clear that there was no price AMD could pay because

17   Intel simply would not allow it. To this day, AMD remains locked out of Fujitsu's Biblo line.

18        59.    **Fujitsu-Siemens.** Fujitsu-Siemens, a European joint-venture, was once a

19   mainstay for AMD's desktop business, with AMD chips powering over 30% of Fujitsu-Siemens'

20   offerings in the consumer sector. In early 2003, Intel offered Fujitsu-Siemens a "special

21   discount" on Celeron processors which Fujitsu-Siemens accepted in exchange for hiding its

22   AMD computers on its website and removing all references to commercial AMD-powered

23   products in the company's retail catalog.

24        60.    Intel has also succeeded in convincing Fujitsu-Siemens to impose market

25   restrictions on its AMD-powered PCs. Its parent, Fujitsu, currently sells an AMD-equipped

26   Lifebook S2010, a commercial notebook, but only in the U.S. and Japan. Fujitsu-Siemens has

27   declined AMD's plea to offer the machine in the European market as well. Similarly, Fujitsu-

28   Siemens designed for the European market the FMC Lifebook MG Series notebook. But it

1    refused to offer that computer in Asia or North America. Finally, although Fujitsu-Siemens

2    produces an AMD commercial desktop, the Scenico, it refuses to advertise it on its website,

3    offering it instead only as a build-to-order product. Having invested significantly to bring these

4    computers to market, Fujitsu-Siemens has been able to offer no explanation for its refusal to

5    exploit them worldwide. AMD's unit share of Fujitsu-Siemens' business recently fell below

6    30% for the first time in four years.

7        61.    **NEC.** Intel was forced to relax its hold on NEC's business when long-time NEC

8    customer, Honda Motor Company, demanded that NEC supply it with servers powered by

9    AMD's Opteron microprocessors. After underwriting the considerable expense of designing and

10    manufacturing an Opteron server for Honda, NEC then inexplicably refused to market the

11    product to any of its other customers.

12        62.    There is no reason, other than Intel's chokehold on the OEMs, for AMD's

13    inability to exploit its products in important sectors, particularly commercial desktops. These

14    computers, which large corporate customers buy in the tens of thousands at a time, represent a

15    lucrative opportunity for the supplier. Yet, the microprocessors that power them are identical to

16    microprocessors in consumer computers, a sector in which AMD has won both praise and market

17    share. The only material difference between the consumer and commercial segments is that

18    many more system builders supply desktops to consumers, making it more difficult for Intel to

19    control their microprocessor choice.

20        3.    **Exclusionary Rebates.**

21        63.    Intel has also imposed on OEMs a system of first-dollar rebates that have the

22    practical and intended effect of creating exclusive or near-exclusive dealing arrangements and

23    artificially foreclosing AMD from competing for a meaningful share of the market. In general,

24    the rebate schemes operate as follows: quarterly, Intel unilaterally establishes for each of its

25    customers a target level of purchases of Intel microprocessors. If the customer achieves the

26    target, it is entitled to a rebate on all of the quarter's purchases of all microprocessors—back to

27    the very first one—generally in the neighborhood of 8-10% of the price paid. Intel provides the

28    rebate in cash at the quarter's close. OEMs operate on razor-thin margins, so qualifying for an

-23-

1   Intel rebate frequently means the difference between reporting a profit or a loss in the coming—

2   and closely watched—quarterly earnings.

3       64.    In contrast to "volume discounts" that sellers offer on a graduated and

4   nondiscriminatory basis to reflect cost efficiencies that accrue when dealing in larger quantities,

5   Intel's is a system of "penetration" or "loyalty" rebates designed to exclude AMD from a

6   substantial portion of the market. Intel intentionally sets a rebate trigger at a level of purchases it

7   knows to constitute a dominant percentage of a customer's needs. It is able to develop

8   discriminatory, customer-by-customer unit or dollar targets that lock that percentage (without

9   ever referencing it) because industry publications accurately forecast and track anticipated sales

10  and because OEM market shares—which industry publications also report weekly, monthly and

11  quarterly—do not change significantly quarter to quarter.

12      65.    Intel's retroactive discounts can operate to price microprocessors so low that

13  AMD is put at a competitive disadvantage it cannot overcome. Consider an OEM which

14  anticipates purchasing 100 microprocessors that both Intel and AMD sell for $100 each. Intel

15  knows that because of its prior model introductions, the customer will have to buy 60 from Intel.

16  The customer considers buying its expected balance for its new models from AMD, but Intel

17  offers it a rebate that will entitle it to a 10% retroactive discount if, but only if, it purchases 90

18  units or more. If the customer buys 30 of the 40 additional units from Intel to qualify for the

19  rebate, its incremental cost for the 30 will be $3,000 (30 units at $100/unit) less the 10% rebate

20  going back to the first unit it purchased, which amounts to $900 (90 units x $10/unit), for a total

21  of $2,100.

22      66.    AMD can only capture the 30 units if it offers a price that makes the customer

23  indifferent between getting the Intel rebate and getting an overall equivalent deal on AMD

24  microprocessors. Thus, for those 30 units, AMD would have to lower its price to $70 per unit

25  (because 30 units x $70/unit equals the $2,100 net cost for buying from Intel). In effect, the

26  rebate forces AMD to charge $20 dollars less than the $90 discounted Intel price if it attempts to

27  get any business from the customer at all. That is because it is selling the customer only 30 units

28  over which it has to spread a $900 discount while Intel can spread it out over 90. At the end of

-24-

1 the day, this creates a serious competitive disadvantage for AMD. As shown in the example,

2 AMD is forced to discount its price three times as much as Intel just to match the Intel

3 discount—not because its processors are inferior—far from it—but because Intel has assured for

4 itself—by its past predatory practices—a significant base of assured demand which enables Intel

5 to inexpensively spread its first-dollar discount. Importantly, this new base of demand—driven

6 by the OEM's purchasing—will enable Intel to repeat its exclusionary practice when the next line

7 of models is unveiled.

8     67.    At least in the short run, most if not all of the major OEMs must engage

9 significantly with Intel: (1) because AMD is too small to service all their needs while continuing

10 to satisfy other customer demand; (2) because to meet customer expectations, OEMs must assure

11 commercial computer buyers that specifications, including the microprocessor, will remain

12 unchanged during the product's lifecycle; and (3) because Intel has encouraged end-users to

13 specify that processors be of the same family among similar computers in one installation, as this

14 is perceived to increase reliability (although technically this is not the case). Intel uses its

15 retroactive discounts to make its large, captive market share self-perpetuating. In any one

16 quarter, AMD cannot economically match Intel's retroactive rebate because it competes for too

17 small a share of the customer's volume over which to spread the dollars necessary to equal the

18 customer's total Intel cost savings. As a result, it loses the business and thus goes into the next

19 selling cycle with Intel imbedded in additional customer product over which Intel can spread its

20 rebates. This serves again to artificially constrain AMD's opportunity to match Intel's ensuing

21 round of retroactive discounts. Intel's intertemporal leveraging of its market share effectively

22 forecloses AMD from ever having a fair opportunity to compete.

23     68.    Intel exacts a severe penalty from OEMs who fail to meet their targets. For

24 example, during the fourth quarter of 2004, AMD succeeded in getting on the HP retail roadmap

25 for mobile computers, and its products sold very well, helping AMD capture nearly 60% of HP's

26 U.S. retail sales for the quarter. Intel responded by withholding HP's fourth quarter rebate check

27 and refusing to waive HP's failure to achieve its targeted rebate goal. Instead, Intel "allowed"

28 HP to make up the shortfall in succeeding quarters when HP promised Intel at least 90% of HP's

1 | mainstream retail business.

2 |     69.    Intel has deployed a variety of variants of this basic rebate scheme. In the case of
3 | one European OEM, for example, Intel imposes the additional condition that the customer
4 | purchase target volumes of specific processors, generally microprocessors against which AMD's
5 | products compete particularly well. In the case of another, Intel offers as an inducement
6 | discounted microprocessors rather than rebates. In the case of the European division of one U.S.
7 | OEM, Intel has imposed a target of between 70-90% of the customer's requirements. Rather than
8 | qualifying the customer for a cash rebate, however, meeting the target entitle s the OEM to
9 | purchase designated processors at up to 20% below "normal" cost, thereby enabling the customer
10 | to obtain favorable pricing on bundled products (*e.g.*, a Centrino-series processor and chipset)
11 | and/or to receive product offerings not available to competitors.

12 |     70.    Intel makes similar offers to smaller OEMs but they are generally unwritten, and
13 | Intel leaves undefined the consequences of failing to meet a target. Thus, a customer falls short
14 | at its peril, knowing only that it may lose its account with Intel and have to source future products
15 | from Intel distributors, which is both more expensive and provides less security of supply than
16 | direct purchase.

17 |     71.    The salient features of all of Intel's rebate schemes are that they are discriminatory
18 | and market-foreclosing. If the customer chooses to purchase any significant quantity of
19 | microprocessors from AMD, it will not qualify for its rebate, and its price will be higher on all
20 | the Intel processors it buys across the board. By tailoring targets to each customer's size and
21 | anticipated volume, Intel locks up significant percentages of the market much more effectively
22 | and at a lesser cost to itself—but to a greater harm to AMD and ultimately consumers—as
23 | compared to offering such rebates for comparable purchase levels to all customers on a
24 | nondiscriminatory basis.

25 |     72.    Intel's use of retroactive rebates leads, in some cases, to below-cost pricing on
26 | incremental sales. The following example shows why a customer's incremental cost of
27 | purchasing from Intel those units that both Intel and AMD could supply (the "contested sales")
28 | can be zero or even negative—a price AMD cannot match. Consider an OEM which has

-26-

CLASS ACTION COMPLAINT

1   purchased 90 units of Microprocessor A at $100 per unit under an Intel rebate scheme that

2   entitles it to a 10% first-dollar discount but only after it purchases more than 90 units. Its cost for

3   the 90 processors is $9,000. The OEM is now considering an additional purchase of a further 10

4   units. If it makes the additional purchase from Intel, the OEM will meet the expenditure

5   condition and will qualify for the 10% per unit discount on all units. Accordingly, the total spent

6   will remain $9,000. The incremental cost of the 10 additional microprocessors—as well as

7   Intel's incremental revenue—will be zero (the $1,000 additionally spent, less the $1,000 thereby

8   saved). In other words, this scheme leads to incremental units being offered to the OEMs for

9   nothing, leaving AMD hopelessly boxed out.

10         73.    Importantly, even if Intel were to earn some incremental revenue on these

11   marginal units, these additional revenues could be below the incremental cost of their production.

12   As a result, Intel's additional profit on the sale would be negative, but for the fact that it had a

13   long-run exclusionary effect on AMD. (Obviously, if Intel earns no revenues on its additional

14   sales, it has to be foregoing profits.) As this analysis shows, some of Intel's discriminatory,

15   retroactive rebates amount to unlawful, predatory below-cost pricing.

16         74.    Even where Intel's prices are above cost on the incremental volumes and overall

17   despite its retroactive rebate schemes, these rebates enable Intel to lower prices selectively in the

18   contested market segment while maintaining higher prices in its captive market. For example,

19   Intel can offer rebates which are granted across the entire volume of sales but which are triggered

20   only if the OEM increases its purchases beyond the portion of its requirements which is captive

21   to Intel. Indeed, Intel can even price above the "monopoly" level for the volumes below the

22   benchmark and offer huge discounts for additional purchases knowing full well that the OEM

23   will not buy less than the benchmark and, instead, source the overwhelming share of its

24   purchases from Intel thereby "qualifying" for the putative rebate while at the same time denying

25   AMD any reasonable volume opportunity.

26         75.    The use of retroactive rebates to limit AMD to a small share of an OEM's

27   business heightens the obstacle to inducing the OEM to launch AMD-powered platforms. OEMs

28   incur substantial expense in designing and engineering a new computer, and make the investment

-27-
CLASS ACTION COMPLAINT

1    only if they foresee a substantial chance of selling a sufficient volume to recoup it. Intel's rebate
2    and other business strategies effectively cap the volumes of AMD-powered products that an
3    OEM can sell. Hence, Intel's practices exacerbate normal impediments to entry and expansion.

4        **4.    Threats of Retaliation.**

5        76.    Beyond exclusive dealing, product and channel restrictions and exclusionary
6    rebates, Intel has resorted to old-fashioned threats, intimidation and "knee-capping" to deter
7    OEMs from dealing with AMD. Intel has a variety of pressure points at its disposal: it can
8    unilaterally reduce or withdraw a discount, rebate or subsidy; it can impose a discriminatory price
9    increase on a disfavored customer, extend a price cut to that customer's competitor, or force
10   retailers into dropping the customer's computers and buying from its competitor instead; or it can
11   delay or dispute an allowance or rebate—all of which can turn a profitable quarter for an OEM
12   into an unprofitable one. Other pressure points on accounts it deems disloyal include threatening
13   to delay or curtail supplies of scarce processors or essential technical information. Examples
14   abound.

15       77.    As Gateway executives have recounted, Intel's threats beat them into
16   "guacamole." But Gateway is not alone. Prior to its merger with HP, Compaq Computer
17   received Intel threats every time it engaged with AMD. In late 2000, for example, Compaq's
18   CEO, Michael Capellas, disclosed that because of the volume of business he had given to AMD,
19   Intel withheld delivery of server chips that Compaq desperately needed. Reporting that "he had a
20   gun to his head," Capellas informed an AMD executive that he had to stop buying AMD
21   processors.

22       78.    In 2002, Intel pointed its gun at NEC. Intel threatened to discontinue providing
23   NEC with the technological roadmap of future Intel products if NEC did not convert its entire
24   line of Value Star L computers to Intel microprocessors. Without that roadmap, NEC would be
25   at a distinct competitive disadvantage. Predictably, NEC succumbed and eliminated AMD from
26   the Value Star L series in 2002 and 2003.

27       79.    NEC's European subsidiary, NEC-CI, which operates NEC's European and non-
28   Japanese Asian divisions, reported that Intel executives said they would "destroy" NEC-CI for

-28-

1  engaging with AMD in the commercial desktop segment. Intel told NEC-CI's retailers that
2  NEC-CI's AMD dealings could impair its ability to supply products to its customers, and when
3  NEC-CI resisted the pressure, Intel imposed a discriminatory price increase.

4      80.    AMD had been engaged in discussions with IBM about introducing an Opteron
5  "blade" server, when IBM suddenly announced that any such product it distributed could not bear
6  an IBM logo. When pressed for an explanation, IBM reported that it could not appear overly
7  supportive of AMD server products because it feared Intel retaliation.

8      **5.    Interference with AMD Product Launches.**

9      81.    Key to gaining quick market acceptance of a new microprocessor is a chipmaker's
10  ability to develop a lineup of reputable launch partners, consisting of OEMs prepared to roll out
11  products featuring the chip, major customers who are willing to buy and embrace it, and other
12  industry allies, such as major software vendors and infrastructure partners who can attest to its
13  quality and reliability. Particularly for commercial and enterprise (*i.e.*, server-work station)
14  purchasers, a successful and impressive "launch" is essential to generating confidence among the
15  computer professionals who will be the potential audience for the new microprocessor.

16     82.    Aware of the importance of product launches, Intel has done its utmost to
17  undermine AMD's. Set forth below are several examples.

18     83.    AMD's September 23, 2003, launch of Athlon64 was a watershed event for the
19  Company. Upon learning the launch schedule, Intel did its best to disrupt it. For example, Acer
20  committed to support the AMD rollout by making a senior executive available for a videotaped
21  endorsement and by timing the introduction of two computers, a desktop and a notebook, to
22  coincide with AMD events planned for Cannes, San Francisco and Taiwan. Days before the
23  event, Intel CEO, Craig Barrett, visited Acer's Chairman, CEO and President in Taiwan,
24  expressed to them Intel's "concern" and said Acer would suffer "severe consequences" if it
25  publicly supported AMD's launch. The Barrett visit coincided with an unexplained delay by
26  Intel providing $15-20 million in market development funds owed to Acer. As a result, Acer
27  withdrew from the launch in the U.S. and Taiwan, pulled its promotional materials, banned
28  AMD's use of the video, and delayed the announcement of its Athlon64-powered computers.

-29-
CLASS ACTION COMPLAINT