1   Acer's President subsequently reported that the only thing different about Intel's threats was the

2   messenger—they were "usually done by lower ranking managers," not Intel's CEO.

3       84. ·   HP also withdrew precipitously from the Athlon64 launch after committing to

4   participate. HP had agreed to support the launch by producing a promotional video and by

5   sending senior executives to all three launch sites. Just before launch, however, HP manager,

6   John Romano, pulled the video and announced that HP would only be sending a junior manager,

7   and then only to Europe.

8       85.   Other AMD customers and channel partners reporting Intel coercion to withdraw

9   from the Athlon64 launch were Lenovo, NEC-CI and Best Buy.

10      86.   Intel also disrupted AMD's launch of its Opteron server chip, which was rolled

11   out on April 22, 2003, with few in attendance and little industry support.  A computer industry

12   journal reported Intel's fingerprints: "They all [vendors] told me that prior to the launch, they

13   received a phone call from Intel.  Intel asked if they were going to the launch.  If they replied yes,

14   the Intel rep asked them if it was 'important to them to go', or 'if they really wanted to go.'

15   Pressing the vendors, I got the same response, 'Intel is too smart to threaten us directly, but it was

16   quite clear from that phone call that we would be risking our various kickback money if we

17   went.'"  (<http://www.theinquirer.net/?article=91397>.)

18      87. ·   Other companies that reported being intimidated from participating in the Opteron

19   launch were MSI, Atipa, Solectron and Fujitsu-Siemens.  Indeed, Intel representatives told

20   Fujitsu-Siemens' executives in the weeks preceding the Opteron launch that if they attended, they

21   would be the only Tier One OEM showing its support as all of the others would back out.  With

22   the exception of IBM, Intel was right.

23      88.   These are not isolated examples, but rather illustrations of Intel's relentless

24   campaign to undermine marketing efforts by its one remaining competitor.  For example, IBM

25   pulled its AMD-powered computers from the 2004 Palisades eServer and PC Show, citing a

26   contractual agreement with Intel said to prohibit it from endorsing those competitive products.

27   And at the 2004 Super Computing Show, an annual conference devoted to high performance

28   computing, Intel offered two other AMD customers money to remove AMD systems from their

-30-
CLASS ACTION COMPLAINT

1  booths. At CeBit, Intel threatened to pull a half million dollars of support from Fujitsu-Siemens

2  for displaying AMD products (which were removed).

3      **6.    Product Bundling.**

4          89.      Intel also uses product bundling as an exclusionary weapon in a variety of ways.

5  Intel's most common deployment is in bidding for a new OEM platform: it bundles

6  microprocessors with free (or heavily discounted) chipsets or motherboards, often offered in

7  amounts exceeding the OEM's requirements for the new platform. (The excess, of course, is only

8  compatible with Intel processors, thereby providing the OEM a strong inducement to go with

9  Intel rather than AMD on uncommitted models.). AMD does not sell chipsets or motherboards;

10  they are provided by independent suppliers such as ATI, nVidia and Via which incur their own

11  costs and control their own pricing. Hence, to match Intel's bundled microprocessor-chipsets-

12  motherboards offer, AMD must extend a discount on its microprocessors that will not only match

13  any Intel discount on the microprocessors themselves but also will compensate the OEM for the

14  savings it will lose on independent Intel chipset and motherboard purchases. The additional

15  compensation AMD is forced to provide through a discount on the sale of microprocessors alone

16  makes AMD's sale of microprocessors potentially unremunerative, and it also enables Intel to

17  avoid competing with AMD directly on microprocessor price and quality by imposing

18  disproportionate burdens on AMD that are

19

20

21

22

23

24

25

26

27

28

1    wholly unrelated to AMD's product quality which, as has been demonstrated, is frequently
2    superior to that of Intel's.

3    90.    As retaliation for dealing with AMD, Intel has also used chipset pricing as a
4    bludgeon. For example, in 2003, Acer had committed to launch the AMD Athlon XP. Acer
5    executives worldwide had been working with AMD to bring the product to market post-launch.
6    But, on the eve of the launch the Acer management in Taiwan pulled the plug. AMD learned
7    from Acer executives that Intel had threatened to raise chipset prices by $10 on all Intel-based
8    Acer systems if any processor business was awarded to AMD outside of Europe.

9    91.    Intel's dealings with OEMs are unlawfully exclusionary, have no pro-competitive
10    justification, and are intended to maintain its monopoly with resultant injury to consumers.

11    **B.    Practices Directed At Distributors.**

12    92.    Intel uses many of the same tactics it practices on OEMs to restrict distributors
13    from carrying AMD processors or selling AMD products into markets it deems strategic. For
14    example, it entered into an exclusive deal with Synnex, which is one of the largest U.S.
15    distributors. Given Intel's 80% plus market share, there is no pro-competitive justification for
16    this arrangement.

17    93.    As with OEMs, Intel offers discounts and rebates to distributors on the condition
18    that they not do business with AMD, either worldwide or in strategic sub-markets. For example,
19    in December of 2004, Ingram Micro, Intel's biggest distributor in China, suddenly cut off
20    discussions to distribute AMD chips as well. A high-ranking Ingram Micro official later reported
21    to AMD that Ingram Micro had no choice because Intel proffered loyalty rebates that were too
22    lucrative to pass up.

23    94.    Intel also offers a panoply of special programs for distributors who carry Intel
24    microprocessors exclusively: marketing bonuses, increased rebates, credit programs for new
25    customers (credits that can be used for all products from Intel and any other suppliers), payment
26    for normal freight charges, and special inventory assistance such as credits to offset inventory
27    costs. When such more nuanced means of achieving exclusivity fail, Intel has simply bribed
28    distributors not to do business with AMD. For example, a high-ranking Tech Data executive

-32-
CLASS ACTION COMPLAINT

1  turned down $1 million to stop doing business with AMD, which caused the Intel representatives

2  to ask, "How much would it take?"

3  95.  Intel also offers retroactive rebates triggered when a distributor reaches a

4  prescribed buying quota. Like the rebates offered to OEMs, the intent is to inflict economic

5  punishment on those who do too much AMD business. But, unlike OEMs, distributors remain

6  ignorant of the goals Intel has set for them or the precise consequences of failing to meet them.

7  Intel does not share this information with them; they simply receive a check at the end of a

8  quarter. As a result, every AMD chip they purchase, they buy at their peril.

9  96.  Finally, those distributors who choose to do business with AMD have been

10  conditioned to expect Intel retaliation. For example, when ASI, one of the largest computer

11  hardware and software distributors, began distributing AMD processors, Intel demanded that it

12  exclude AMD personnel from its ASI Technology Shows and its General Managers' meetings.

13  Until recently, ASI refused master distributor status from AMD, despite the financial benefits

14  attached, because it feared that such a public alignment with AMD would trigger Intel retaliation.

15  When, in January of 2005, it finally accepted Master Distributor status, Intel began reducing the

16  level of market development funds ASI received.

17  97.  Avnet Inc., one of the world's largest computer equipment distributors and an avid

18  AMD supporter, has also received its share of Intel intimidation. Thus, Avnet cited Intel as the

19  reason it could not distribute AMD parts to the industrial sector. And when AMD launched its

20  Opteron server chip, Intel made clear it would make it "painful" for Avnet were it to begin

21  distributing that chip. When Avnet did so anyway, Intel threatened to cut if off. Another

22  distributor got even worse treatment. In retaliation for Supercom's AMD dealings in Canada,

23  Intel pressured Supercom's customers to switch to another distributor.

24  98.  These are not the only distributors that Intel has attempted to coerce from doing

25  business with AMD. Others include R.I.C. in Germany, Paradigit in the Netherlands, and Quote

26  Components, also in the Netherlands.

27

28

1    99.    Intel's dealings with distributors are unlawfully exclusionary, have no pro-
2    competitive justification, and are intended to maintain its monopoly.

3    **C.    Practices Directed At Retailers.**

4    100.    In both the U.S. and internationally, approximately one fifth of desktop and
5    notebook computers is purchased at retail stores. A handful of retailers dominate the U.S. PC
6    market: Best Buy and Circuit City are the largest. Other significant but smaller retailers are
7    Walmart/Sams Club, Staples, Office Depot and Office Max.

8    101.    Most of the PCs sold at retail are sold during four or five "buying seasons" that
9    correspond to events on the calendar ("Dads and Grads," "Back to School," "Holiday," etc.), and
10    retailers refresh their inventory for each. A chipmaker faces a two-step process to get its
11    platform on retail shelves: first, it must convince one or more OEMs to build machines using its
12    microprocessor at a suggested price point (called "getting on the roadmap"); and second, it must
13    convince the retailer to stock and devote shelf space to these machines. Shelf space does not
14    come for free. The major retailers demand market development funds ("MDF") in exchange.
15    MDF can consist of cooperative advertising support, but more frequently it comprises a
16    marketing-related opportunity that a chipmaker must buy for tens of thousands of dollars, for
17    example, space in a Sunday circular, an in-store display or an internet training opportunity with
18    the chain's sales staff. The MDF required to secure shelf space can run as high as $25 per box
19    depending on the computer price point and how urgently the competing chipmakers want the
20    shelf space.

21    102.    Intel has historically enjoyed an advantage over AMD at retail because, using
22    many of the strategies described above, it has had greater access to the OEMs' roadmaps and the
23    ability to exert pressure to keep AMD out of their product plans. Also, it has significantly greater
24    financial resources with which to buy retail shelf space.

25    103.    But to leverage those advantages, Intel has also made exclusive deals with many
26    key retailers around the world. For example, until recently Office Depot declined to stock AMD-
27    powered notebooks regardless of the amount of MDF AMD offered, citing its "premier" status
28    with Intel that would be put at risk. Fry's is Fujitsu's only retailer in the United States. When

-34-

1  Intel learned that Fry's was very successfully marketing a Fujitsu's Athlon™ XP-based

2  notebook, it offered Fry's a large payment to remove it from its shelves.

3        104.   The story is even worse in Europe. AMD has been entirely shut out from Media

4  Markt, Europe's largest computer retailer, which accounts for 35% of Germany's retail sales.

5  Intel provides Media Markt between $15-20 million of MDF annually, and since 1997 Media

6  Markt has carried Intel computers exclusively. Intel subsidies also foreclose AMD from Aldi, a

7  leading German food retail chain, whose PC sales account for an additional 15-20% of the

8  German market.

9        105.   In the United Kingdom, Intel has locked up substantially all of the business of

10  DSG (Dixon Services Group), operator of three major chains including Dixon and PC World that

11  collectively account for two thirds of the U.K. PC market. In exchange for Intel payments, DSG

12  has agreed to keep AMD's share of its business below 10%. Like Media Markt, DSG reports that

13  Intel penalizes it with reduced MDF just on account of the small amount of business it does with

14  AMD. Toys 'R' Us in the U.K. is also exclusive to Intel. Time, another U.K. retailer (which

15  builds computers as well), took a substantial MDF payment from Intel in exchange for near-

16  exclusivity on notebooks during the first half of 2004, and it reports that Intel has withheld

17  discounts because Time has introduced too many AMD Athlon64 desktop models. In France,

18  Intel has brought pressure on the largest retailers, including Conforama, Boulanger, causing them

19  to cease dealing with AMD or drastically reduce their AMD business.

20        106.   AMD has nonetheless made some progress in gaining retail market share.

21  Because of price/performance advantages, which are key in retail, OEMs build approximately

22  15% of their U.S. domestic market desktops with AMD processors; within notebook roadmaps,

23  AMD represents approximately 10%. On a shelf-space to sales basis, AMD has generally

24  outperformed Intel. For instance, in the desktop segment during the fourth quarter of 2004,

25  AMD-equipped computers captured between a 33%-38% share of Circuit City's sales, despite

26  being limited to five of the 25 models (20%) on the Circuit City shelves. And with

27  approximately 15% of the shelf space allotted to its products at Best Buy and CompUSA, AMD

28  computers accounted for roughly 30% and 22% of their sales, respectively. These numbers

-35-
CLASS ACTION COMPLAINT

1    confirm that AMD's products perform well at retail, provided that space is available.

2    107.    In fact, Intel's sales staff was instructed "not to let this happen again." As a result,
3    Intel instituted a rebate program similar to what it foisted on OEMs, with similar exclusionary
4    effect. Under this program, Intel provides full MDF payments to retailers, such as Best Buy and
5    Circuit City, only if they agree to limit to 20% not just the shelf space devoted to AMD35 based
6    products, but also the share of revenues they generate from selling AMD platforms. If AMD's
7    share exceeds 20%, the offending retailer's marketing support from Intel is cut by 33% across all
8    products.

9    108.    This is how the program works at Circuit City. If less than 20% of Circuit City's
10    notebook revenue derives from AMD-based computers (30% for desktops), Intel has agreed to
11    pay Circuit City $15 in MDF per Intel-powered machine; but if the AMD percentage reaches or
12    exceeds 20%, Circuit City's MDF subsidy is cut to $10. This creates a $5 per box "tax" on the
13    retailer for doing 20% or more of its dollar volume with AMD-powered machines; and this "tax"
14    is applicable to all of the Intel-powered machines that the retailer buys, back to the very first
15    machine.

16    109.    The following illustrates the competitive disadvantage this creates for AMD: if
17    Circuit City were to purchase only Intel-powered notebooks for its 200,000-unit inventory in a
18    quarter, Intel would pay it $15 of MDF per computer, or a total of $3 million. However, if
19    Circuit City were to reduce its purchases of Intel-based notebooks to 80% (160,000 units) so that
20    it could stock a modest number of AMD-powered computers, Intel MDF would fall to $1.6
21    million ($10 MDF/unit times 160,000 units). Were AMD to match Intel's $10 per unit MDF on
22    the 40,000 unit s it supplied, Circuit City would receive an additional $400,000, bringing its total
23    MDF to $2 million, leaving it $1 million worse off for doing business with AMD. For AMD to
24    make Circuit City "whole," it would have to vastly increase its MDF on its 20% share to $35
25    MDF per unit (40,000 x $35 = $1.4M), which together with Intel's $1.6 million would bring the
26    total MDF back to $3 million. In other words, to just capture a 20% share, AMD must offer two
27    or three times as much MDF as Intel—because it has far fewer units over which to spread the
28    difference. Given these perverse economies, Circuit City is not likely to allocate less than 80%

-36-

1 | of its notebook sales to Intel, even if it means taking AMD stock off the shelves at the end of a

2 | quarter. (Indeed, to avoid inadvertently running afoul of the limitation, a prudent distributor

3 | would keep AMD's share well short of 20%.)

4 |       110.    Nor is Intel above threatening retailers to gain preferred treatment. For example,

5 | at the recent CeBit computer show in Hanover, Germany (the largest computer show in the

6 | world), a German chain, Vobis, hung an AMD Turion64 banner from its booth as part of a co-

7 | marketing agreement with AMD and its OEM partner (Yakamo) to announce AMD's new

8 | mobile microprocessor. Intel's German general manager and its vice president for mobile

9 | products demanded that the Turion64 banner be removed. When Vobis' CEO declined, the Intel

10 | representatives threatened immediately to stop microprocessor shipments to Vobis ' supplier.

11 | The banner was removed before the CeBit show opened.

12 |       111.    Intel's dealings with retailers are unlawfully exclusionary, have no pro-

13 | competitive justification, and are intended to maintain its monopoly.

14 | **D.    Intel's Standard Setting and Other Technical Abuses.**

15 |       **1.    Intel's Exclusion of AMD from Industry Standards.**

16 |       112.    Companies within the computer industry often agree to design certain aspects of

17 | their products in accordance with industry standards to ensure broad compatibility. Indeed,

18 | standards are not only ubiquitous in the computer industry, they are essential. But when a

19 | company is unfairly excluded from the standards-setting process or is denied timely access to the

20 | standard, competition can be restrained in a way that reverberates throughout the entire market.

21 | Intel has employed, and continues to employ, a variety of tactics that have the purpose and effect

22 | of excluding and/or hampering AMD's full and active participation in the development of

23 | important industry standards. It has also worked to deny AMD timely access to such standards.

24 | Its efforts have hampered AMD's ability to vigorously compete in the market.

25 |       113.    By way of example, Intel and AMD each develop and manufacture memory

26 | controller technologies that allow their processors and related components to communicate with

27 | memory. Intel designs and manufactures an entirely separate chip for this purpose, known as the

28 | Graphics and Memory Controller Hub, but AMD embeds its memory controllers directly into its

1   processors, thus dispensing with the need for an extra chip and speeding up communication.

2   Both companies need to know and have access to memory standards well in advance of

3   producing their processors and/or chipsets so that their memory controller designs will be

4   compatible with the next generation of memory devices.

5       114.    The Joint Electron Device Engineering Council ("JEDEC") is the industry

6   organization responsible for the standards governing the most recent generations of computer

7   memory chips.  Even though JEDEC was already developing the standards for the next

8   generation of memory chips, Intel convened a secret committee that it dubbed the Advanced

9   DRAM Technology ("ADT") Consortium to develop a competing memory standard.

10      115.    The ADT Consortium was cleverly structured with multiple tiers of membership,

11  each with different levels of access to information.  The majority of companies were consigned to

12  the lowest tier, meaning that they would receive access to the memory standard only upon its

13  completion, but not during its development.  The actual development effort was undertaken by

14  companies with the highest tier membership status, which Intel reserved for itself and the major

15  memory manufacturers.  No other companies were allowed input or full access to the standard

16  during its development by the ADT Consortium.

17      116.    AMD desperately needed access to the developing standard, and input into its

18  definition, in order to be able to launch a microprocessor with updated memory controller

19  technology at the same time as Intel.  AMD lobbied repeatedly for higher tier membership status,

20  but was continually turned down.  Intel had structured the ADT Consortium's rules to require a

21  unanimous vote—a rule that gave Intel veto power—over any decision to allow AMD to join the

22  development committee; and it used that veto power to cause the Consortium arbitrarily to reject

23  AMD's application.

24      117.    By foreclosing AMD from input or access to the memory standard during its

25  development process, Intel deliberately placed AMD at a severe competitive disadvantage.  As a

26  consequence of its exclusion, AMD had no opportunity to monitor participants' suggestions and

27  to object to Intel-proposed features that were without substantial benefit to consumers and were

28  instead motivated by Intel's desire to disadvantage AMD's microprocessor architecture.

-38-
CLASS ACTION COMPLAINT

1   Furthermore, by keeping the ADT Consortium memory standard-setting process shrouded in
2   secrecy, Intel was able to gain a significant head start. While the ADT Consortium was
3   ultimately unsuccessful in implementing an industry standard, this type of exclusionary conduct
4   exemplifies Intel's attempts to use industry standard-setting to competitively disadvantage AMD
5   in an unlawfully exclusionary manner.

6       118.    Indeed, Intel is attempting a repeat performance with respect to a new memory
7   standard, this time excluding AMD by avoiding the open standard-setting committee entirely.
8   Intel is currently coercing the major memory producers into signing non-disclosure agreements
9   and working exclusively with Intel in a "secret" committee to develop the next generation
10  memory interface standard. Once under this agreement, the memory manufacturers are
11  prohibited from sharing information about their own product designs implementing the memory
12  interface standard. This has the effect of preventing AMD from completing the design of its
13  processor memory controllers until Intel permits memory manufacturers to communicate their
14  interface specifications to the industry.

15      119.    By this scheme, Intel tightens its control over the industry by converting what the
16  component manufacturers intend as a public standard into a proprietary one, and thereby
17  guarantees itself an undeserved head-start and unfair competitive advantage.

18      **2.    Intel's Promotion of Industry Standards that Disadvantage AMD.**

19      120.    Even where it has been unable to exclude AMD from participating in the
20  development of industry standards, Intel has attempted to drive the adoption of standards having
21  no substantial consumer benefit and whose sole or dominant purpose was to competitively
22  disadvantage AMD based on its highly integrated microprocessor architecture.

23      121.    As an example, in 2004, JEDEC began developing standards governing the design
24  of the memory modules for next generation ("DDR3") memory devices. These modules, known
25  as dual inline memory modules, or "DIMMs," consisted of printed circuit boards upon which a
26  number of memory chips were mounted. The DIMMs connected the memory chips to the
27  computer's motherboard through a series of metal connectors known as "pins." One purpose of
28  the JEDEC standards was to define the functions of these pins so as to enable chipmakers to

-39-
CLASS ACTION COMPLAINT

1   design compatible memory controllers that would allow their microprocessors and the memory
2   on the DIMMs to communicate.

3        122.   The JEDEC committee, which consists of members representing companies
4   throughout the computer industry, had already adopted a scheme for defining the pins for the
5   previous generation ("DDR2") DIMMs used in desktop and laptop computers. When the JEDEC
6   committee began work on standards for DDR3 memory modules for desktop computers, Intel
7   proposed that the committee adopt a pin definition similar to that used for the DDR2 memory
8   modules. This proposal made perfect sense, as Intel explained to the committee, because it
9   allowed DDR3 memory controllers to be compatible with DDR2 and DDR3 memory modules.

10       123.   However, when the JEDEC committee began to define the pins for DDR3 laptop
11   memory modules in this consistent manner, Intel completely reversed its position, counter
12   proposing instead that the committee rearrange the pin definitions. Intel's proposal had no
13   discernable technical merit or basis.

14       124.   In fact, Intel's motivation for proposing modification of the laptop memory
15   module pin definition was to competitively disadvantage AMD. Any modification to the laptop
16   memory module pin definition would require Intel and AMD to make corresponding
17   modifications of their memory controllers. AMD's microprocessor design, while representing a
18   huge breakthrough in integration, embeds the memory controller directly into its microprocessor.
19   While this produces significant computing advantages, modification of an embedded memory
20   controller requires significantly more time and expense.

21       125.   Knowing this vulnerability, Intel proposed its modified DDR3 memory module
22   pin definition for laptop computers for the purpose of delaying AMD's introduction of a
23   technologically superior part. While Intel's proposal was ultimately rejected by the JEDEC
24   committee, confirming the proposal's complete lack of technical merit, this is yet another
25   example of how Intel has attempted to drive industry standards to achieve its exclusionary ends.

26      **3.**    **Intel's Leveraging of Its Other Product Lines to Unfairly Disadvantage AMD**
27           **in the Marketplace.**

28      126.   Intel has also designed and marketed microprocessor-related products with the

-40-
CLASS ACTION COMPLAINT

1 | goal of compromising performance for those who opt for AMD solutions, even if it requires
2 | sacrificing its own product quality and integrity.

3 |     127.   An example is Intel's compilers. Generally, independent software vendors
4 | ("ISVs") write software programs in high-level languages, such as C, C++, or Fortran. Before
5 | these programs can be understood by a computer system, they must be translated into object
6 | code—a machine-readable language—by a software program called a compiler. Different
7 | companies write compilers for different operating systems (Windows, Linux, etc.) and for
8 | different programming languages (C, C++, Fortran, etc.). Intel offers compilers for use with a
9 | variety of different operating systems and programming languages.

10 |     128.   Intel's compilers are designed to perform specialized types of optimizations that
11 | are particularly advantageous for ISVs developing software programs that rely heavily upon
12 | floating point or vectorized mathematical calculations. Such programs include, for example,
13 | mathematical modeling, multimedia, and video game applications.

14 |     129.   Intel has designed its compiler purposely to degrade performance when a program
15 | is run on an AMD platform. To achieve this, Intel designed the compiler to compile code along
16 | several alternate code paths. Some paths are executed when the program runs on an Intel
17 | platform and others are executed when the program is operated on a computer with an AMD
18 | microprocessor. (The choice of code path is determined when the program is started, using a
19 | feature known as "CPUID" which identifies the computer's microprocessor.) By design, the
20 | code paths were not created equally. If the program detects a "Genuine Intel" microprocessor, it
21 | executes a fully optimized code path and operates with the maximum efficiency. However, if the
22 | program detects an "Authentic AMD" microprocessor, it executes a different code path that will
23 | degrade the program's performance or cause it to crash.

24 |     130.   ISVs are forced to choose between Intel's compilers, which degrade the
25 | performance of their software when operated with AMD microprocessors, or third-party
26 | compilers, which do not contain Intel's particular optimizations. Sadly for AMD and its
27 | customers, for legitimate reasons Intel's compilers appeal to certain groups of ISVs, especially
28 | those developing software programs that rely heavily on floating point and vectorized math

1    calculations. Unbeknownst to them, performance of their programs is degraded when run on an

2    AMD microprocessor not because of design deficiencies on the part of AMD, but deviousness on

3    the part of Intel.

4    ## VIII.  EFFECTS OF INTEL'S MISCONDUCT

5         131.    Intel's unlawful conduct has caused and will continue to cause substantial harm to

6    competition in the market for x86 microprocessors in domestic, import, and export trade. Were it

7    not for Intel's acts, AMD and others would be able to compete for microprocessor business on

8    competitive merit, both domestically and internationally, bringing customers and end-product

9    consumers such as plaintiffs, lower prices, enhanced innovation, and greater freedom of choice.

10         132.    Intel's anticompetitive acts both inside and outside the territorial boundaries of the

11    United States have a direct, substantial, and reasonably foreseeable effect on trade and commerce

12    that is not trade and commerce with foreign nations, and on United States trade and commerce.

13    In maintaining its monopoly by unlawfully denying rivals a competitive opportunity to achieve

14    minimum levels of efficient scale, Intel must necessarily exclude them from the product market

15    world wide. As the domestic U.S. market is an integral part of the world market, successful

16    monopolization of the U.S. market is dependent on world market exclusion, lest foreign sales

17    vitalize a rival's U.S. competitive potential.

18         133.    Intel's conduct throughout the world has caused and will continue to cause

19    substantial harm to the business of AMD in the domestic, import, and export trades, in the form

20    of artificially constrained market share, lost profits and increased costs of capital. Additionally,

21    that same conduct has had, and will continue to have, a direct, substantial, and reasonably

22    foreseeable effect on AMD's ability to sell its goods to foreign customers in restraint of its U.S.-

23    based and directed business, including its U.S. export business. These harms are evidenced by

24    the following:

25         •    When AMD first entered the server market in 2002 with its Athlon

26              microprocessor—a part designed for desktops, not servers—the small OEMs and

27              white-box vendors deploying the chip nonetheless managed to secure

28              approximately 3% of the worldwide server market. AMD introduced its next

-42-

1    generation Opteron microprocessor for servers the following year, and the chip
2    won rave reviews and passionate customer testimonials, including Best of Show at
3    the June 2003 ClusterWorld Conference and Expo and Best Processor award in
4    July of 2003 from *InfoWorld*. Nonetheless, by means of its exclusionary and
5    anticompetitive conduct, as of the fourth quarter of 2004, Intel had limited AMD's
6    worldwide server market share to less than 5%, not appreciably more than before
7    it introduced the Opteron.

8    •    Intel's exclusionary conduct has successfully boxed AMD out of the notebook
9    sector. Its exclusive deals with Dell, Sony and Toshiba alone bar AMD from a
10    third of the world market and half of U.S. domestic sales. Intel's economic
11    coercion and fidelity rebates have foreclosed AMD from an appreciable share of
12    the remainder.

13    •    AMD's Athlon64 is widely recognized as fully competitive with Intel's best
14    desktop offering with the added benefit that it can run 64-bit software.
15    Nonetheless, with the exception of a channel-restricted HP machine and a single
16    Fujitsu-Siemens' model, AMD has failed to get a single major OEM—which
17    collectively dominate the lucrative commercial desktop sector—to launch broadly
18    an Athlon64 commercial desktop. Fortune 500 companies won't take a chance on
19    AMD unless it partners with a Tier One desktop OEM, but Intel's exclusionary
20    conduct, including its economic coercion of Dell, HP, IBM, Gateway and Acer,
21    prevents that from happening. As a result, AMD's commercial desktop share is no
22    greater now than it was in 2002.

23    ## IX.    FIRST CLAIM FOR RELIEF

24    ### (Violation of Section 2 of the Sherman Act)

25    134.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every
26    allegation set forth in the preceding paragraphs of this complaint.

27    135.    The x86 Microprocessor Market is a relevant product market within the meaning
28    of the antitrust laws.

-43-

1        136.    The relevant geographic market is the world and a relevant geographic submarket

2    is the United States.

3        137.    Intel possesses monopoly power in the relevant market, maintaining a market

4    share of over 90% by revenue and 80% by unit volume.

5        138.    Substantial barriers to entry and expansion exist in the relevant market.

6        139.    Intel has the power to control prices and exclude competition.

7        140.    Intel has engaged in conduct with anticompetitive effects: (a) to unlawfully

8    maintain and enhance its monopoly in the relevant market and to keep prices high; and (b) to

9    stifle competition and to eliminate consumer choice through unlawfully exclusionary behavior

10    designed to keep AMD weak, undersized, and unable to achieve a minimum efficient scale of

11    operation needed to become a viable substitute for Intel with respect to significant customers, or

12    to an essential portion of the market. It has done so with the intent to maintain its monopoly in

13    the relevant market.

14        141.    Intel has also combined or conspired with others, including others identified

15    above, to monopolize the market for x86 microprocessors in the United States and elsewhere.

16        142.    There is no legitimate business justification for Intel's conduct.

17        143.    Plaintiffs and the members of the Class have been injured and will continue to be

18    injured in their business and property by paying more for x86 microprocessors purchased

19    indirectly from Intel than they would have paid and will pay in the absence of the Intel's

20    unlawful acts, including paying more for personal computers and other products in which x86

21    microprocessors are a component as a result of higher prices paid for x86 microprocessors by the

22    manufacturers of those products.

23        144.    Plaintiffs and the members of the Class are entitled to an injunction against Intel,

24    preventing and restraining the violations alleged herein. Plaintiffs and members of the Class

25    have no adequate remedy at law for Intel's ongoing or threatened conduct.

26        **X.    SECOND CLAIM FOR RELIEF**

27        **(Violation of California's Cartwright Act)**

28        145.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every

1    allegation set forth in the preceding paragraphs of this Complaint.

2        146.    Intel's unlawful conduct was centered in, carried out, effectuated and perfected

3    mainly within the State of California, and Intel's conduct within California injured all members

4    of the Class throughout the United States. Therefore, this claim for relief under California law is

5    brought on behalf of all members of the Class, whether or not they are California residents.

6        147.    Intel and certain co-conspirators entered into and engaged in a continuing

7    unlawful combination, trust, agreement, understanding and concert of action in restraint of the

8    trade and commerce described above in violation of Section 16720 of the California Business and

9    Professions Code. Intel and others have agreed, combined and conspired in violation of Section

10    16720 to monopolize the x86 processor market through unlawful means.

11        148.    The aforesaid violations of Section 16720 of the California Business and

12    Professions Code consisted, without limitation, of a continuing unlawful combination, trust,

13    agreement, understanding and concert of action between Intel and its co-conspirators.

14        149.    For the purpose of forming and effectuating the unlawful combination, trust,

15    agreement, understanding, and concert of action, Intel and those with whom it combined and

16    conspired have done those things which they combined and conspired to do, including but in no

17    way limited to the acts, practices and court of conduct set forth above.

18        150.    Plaintiffs and the other members of the Class paid supra-competitive, artificially

19    inflated prices for x86 microprocessors as a result of this conduct and have had their competitive

20    choices of x86 microprocessors improperly limited.

21        151.    As a direct and proximate result of Intel's and its co-conspirators' unlawful

22    conduct, Plaintiffs and the members of the Class have been injured in their business and property

23    in that they paid more for x86 microprocessors than they otherwise would have paid in the

24    absence of Intel's unlawful conduct. As a result of Intel's and its co-conspirators' violation of

25    Section 16720 of the California Business and Professions Code, Plaintiffs seek treble damages

26    and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the

27    California Business and Professions Code.

28

-45-

CLASS ACTION COMPLAINT

## XI.    THIRD CLAIM FOR RELIEF

### (Violation of the California Unfair Competition Law)

152. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

153. Intel's unlawful conduct was centered in, carried out, effectuated and perfected mainly within the State of California, and Intel's conduct within California injured all members of the Class throughout the United States. Therefore, this claim for relief under California law is brought on behalf of all members of the Class, whether or not they are California residents.

154. Intel has committed and continues to commit acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above.

155. This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from Intel for acts, as alleged herein, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law.

156. Intel's conduct as alleged herein violated Section 17200. The acts, omissions, misrepresentations, practices and non-disclosures of Intel, as alleged herein, constituted a common continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Section 17200, *et seq.*, including, but not limited to, the following:

     a.    The violations of Section 2 of the Sherman Act (15 U.S.C. §2), as set forth above;

     b.    Violations of Section 3 of the Clayton Act (15 U.S.C. §14);

     c.    The violations of Sections 16720 *et seq.*, 17045, 17046, 17047, and 17048 of the California Business and Professions Code;

     d.    Intel's acts, omissions, misrepresentations, practices and non-disclosures, as described above, whether or not in violation of Sections 16720, *et seq.*, 17045, 17046, 17047, and 17048 of the California Business and

-46-

| | | |
|---|---|---|
| 1 | | Professions Code, and whether or not concerted or independent acts, are |
| 2 | | otherwise unfair, unconscionable, unlawful or fraudulent; |
| 3 | e. | Intel's act and practices are unfair to consumers of x86 microprocessors in |
| 4 | | the State of California and throughout the United States, within the |
| 5 | | meaning of Section 17200 of the California Business and Professions |
| 6 | | Code; and |
| 7 | f. | Intel's acts and practices are fraudulent or deceptive within the meaning of |
| 8 | | Section 17200 of the California Business and Professions Code. |

9    157.    Plaintiffs and each of the Class members are entitled to full restitution and/or

10  disgorgement of all revenues, earnings, profits, compensation and benefits which may have been

11  obtained by Intel as a result of such business acts or practices.

12    158.    The illegal conduct alleged herein is continuing and there is no indication that

13  Intel will not continue such activity into the future.

14    159.    The unlawful and unfair business practices of Intel, as described above, have

15  caused and continue to cause Plaintiffs and the members of the Class to pay supra-competitive

16  and artificially-inflated prices for x86 microprocessors. Plaintiffs and the members of the Class

17  suffered injury in fact and lost money or property as a result of such unfair competition.

18    160.    The conduct of Intel as alleged in this Complaint violates Section 17200 of the

19  California Business and Professions Code.

20    161.    As alleged in this Complaint, Intel has been unjustly enriched as a result of its

21  wrongful conduct and by Intel's unfair competition. Plaintiff and the members of the Class are

22  accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues,

23  earnings, profits, compensation and benefits which may have been obtained by Intel as a result of

24  such business practices, pursuant to the California Business and Professions Code, Sections

25  17203 and 17204.

26                          **XII.    FOURTH CLAIM FOR RELIEF**

27                      **(Violations of California's Tort Law Against Monopoly)**

28    162.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every

1    allegation set forth in the preceding paragraphs of this Complaint.

2         163.    By virtue of the conduct described above, Intel has engaged in tortious and

3    unlawful monopolization of the x86 microprocessor market.

4         164.    Such conduct gives rise to a cause of action for common law monopoly under

5    California law.

6         165.    As a direct and proximate result of Intel's acts of monopolization alleged herein,

7    plaintiffs and the members of the Class have suffered actual damages in an amount to be proven

8    at trial.

9         166.    Intel's acts of monopolization described herein were intended to monopolize and

10   suppress competition in the relevant market and to injure consumers. Intel's acts included acts of

11   fraud, malice and oppression and were undertaken with conscious disregard of the rights of

12   consumers, including plaintiffs and members of the Class. Accordingly, an award of punitive

13   damages is justified in order to make an example of Intel, to punish it and to deter it and others

14   from engaging in the same or similar conduct. Plaintiffs and members of the Class seek an award

15   of punitive damages in an amount according to proof at trial.

16                          **XIII.   FIFTH CLAIM FOR RELIEF**

17                  **(Violations of State Antitrust and Unfair Competition Laws)**

18        167.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every

19   allegation set forth in the preceding paragraphs of this Complaint.

20        168.    By reason of the foregoing, Intel has restrained trade in violation of Alabama

21   Code §§8-10-1 *et seq.*.

22

23

24

25

26

27

28

-48-
CLASS ACTION COMPLAINT

1    169.    By reason of the foregoing, Intel has restrained trade in violation of Arizona

2  Revised Stat. §§44-1401 *et seq.*

3    170.    By reason of the foregoing, Intel has restrained trade in violation of California

4  Bus. & Prof. Code §§16700 *et seq.* and Cal. Bus. & Prof. Code §§17200 *et seq.*

5    171.    By reason of the foregoing, Intel has restrained trade in violation of District of

6  Columbia Code Ann. Code §§28-4503 *et seq.*

7    172.    By reason of the foregoing, Intel has restrained trade in violation of Iowa Code

8  §§553.1 *et seq.*

9    173.    By reason of the foregoing, Intel has restrained trade in violation of Kansas Stat.

10  Ann §§50-101 *et seq.*

11    174.    By reason of the foregoing, Intel has restrained trade in violation of Maine Rev.

12  Stat. Ann. 10, §§1101 *et seq.*

13    175.    By reason of the foregoing, Intel has restrained trade in violation of Michigan

14  Comp. Laws. Ann. §§445.773 *et seq.*

15    176.    By reason of the foregoing, Intel has restrained trade in violation of Minnesota

16  Stat. §§325D.52 *et seq.*

17    177.    By reason of the foregoing, Intel has restrained trade in violation of Mississippi

18  Code Ann. §§75-21-1 *et seq.*

19    178.    By reason of the foregoing, Intel has restrained trade in violation of Nebraska

20  Rev. Stat. §§59-801 *et seq.*

21    179.    By reason of the foregoing, Intel has restrained trade in violation of Nevada Rev.

22  Stat. Ann. §§598A *et seq.*

23    180.    By reason of the foregoing, Intel has restrained trade in violation of New Mexico

24  Stat. Ann. §§57-1-1 *et seq.*

25    181.    By reason of the foregoing, Intel has restrained trade in violation of North

26  Carolina Gen. Stat. §§75-1 *et seq.*

27    182.    By reason of the foregoing, Intel has restrained trade in violation of North Dakota

28  Cent. Code §§51-08.1-01 *et seq.*

-49-

1    183.    By reason of the foregoing, Intel has restrained trade in violation of Ohio Rev.
2    Code Ann. §§1331.01 *et seq.*

3    184.    By reason of the foregoing, Intel has restrained trade in violation of Pennsylvania
4    common law.

5    185.    By reason of the foregoing, Intel has restrained trade in violation of South Dakota
6    Codified Laws Ann. §§37-1 *et seq.*

7    186.    By reason of the foregoing, Intel has restrained trade in violation of Tennessee
8    Code Ann. §§47-25-101 *et seq.*

9    187.    By reason of the foregoing, Intel has restrained trade in violation of Vermont Stat.
10   Ann. 9 §§2453 *et seq.*

11   188.    By reason of the foregoing, Intel has restrained trade in violation of West Virginia
12   §§47-18-1 *et seq.*

13   189.    By reason of the foregoing, Intel has restrained trade in violation of Wisconsin
14   Stat. §§133.01 *et seq.*

15   190.    Class Members in each of the states listed above paid supra-competitive,
16   artificially inflated prices for x86 microprocessors. As a direct and proximate result of Intel's
17   unlawful conduct, such members of the Class have been injured in their business and property in
18   that they paid more for x86 microprocessors than they otherwise would have paid in the absence
19   of Intel's unlawful conduct.

20                          **XIV.    SIXTH CLAIM FOR RELIEF**

21              **(Violation of State Consumer Protection and Unfair Competition Laws)**

22   191.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every
23   allegation set forth in the preceding paragraphs of this Complaint.

24   192.    Intel engaged in unfair competition or unfair, unconscionable, deceptive or
25   fraudulent acts or practices in violation of the state consumer protection and unfair competition
26   statutes listed below.

27   193.    Intel has engaged in unfair competition or unfair or deceptive acts or practices in
28   violation in violation of Alaska Code §§45.50.471 *et seq.*

-50-

1    194.    Intel has engaged in unfair competition or unfair or deceptive acts or practices in

2    violation of Arkansas Revised Stat. §§4-88-101 *et seq.*

3    195.    Intel has engaged in unfair competition or unfair or deceptive acts or practices in

4    violation of California Bus. & Prof. Code §§17200 *et seq.*

5    196.    Intel has engaged in unfair competition or unfair or deceptive acts or practices in

6    violation of District of Columbia Code §§28-3901 *et seq.*

7    197.    Intel has engaged in unfair competition or unfair or deceptive acts or practices in

8    violation of Florida Stat. §501.201 *et seq.*

9    198.    Intel has engaged in unfair competition or unfair or deceptive acts or practices in

10    violation of Hawaii Rev. Stat. §480 *et seq.*

11    199.    Intel has engaged in unfair competition or unfair or deceptive acts or practices in

12    violation of Maine Rev. Stat. Ann. 10, §§1101 *et seq.*

13    200.    Intel has engaged in unfair competition or unfair or deceptive acts or practices in

14    violation of Idaho Code §48-601 *et seq.*

15    201.    Intel has engaged in unfair competition or unfair or deceptive acts or practices in

16    violation of Kansas Stat. §50-623 *et seq.*

17    202.    Intel has engaged in unfair competition or unfair or deceptive acts or practices in

18    violation of Louisiana Rev. Stat. §51:1401 *et seq.*

19    203.    Intel has engaged in unfair competition or unfair or deceptive acts or practices in

20    violation of 5 Maine Rev. Stat §207 *et seq.*

21    204.    Intel has engaged in unfair competition or unfair or deceptive acts or practices in

22    violation of Montana Code §30-14-101 *et seq.*

23    205.    Intel has engaged in unfair competition or unfair or deceptive acts or practices in

24    violation of Nebraska Rev. Stat. §59-1601 *et seq.*

25    206.    Intel has engaged in unfair competition or unfair or deceptive acts or practices in

26    violation of New Mexico Stat. §57-12-1 *et seq.*

27    207.    Intel has engaged in unfair competition or unfair or deceptive acts or practices in

28    violation of New York Gen. Bus. Law §349 *et seq.*

CLASS ACTION COMPLAINT

1    208.    Intel has engaged in unfair competition or unfair or deceptive acts or practices in

2    violation of North Carolina Gen. Stat. §75-1.1 *et seq.*

3    209.    Intel has engaged in unfair competition or unfair or deceptive acts or practices in

4    violation of Oregon Rev. Stat. §646.605 *et seq.*

5    210.    Intel has engaged in unfair competition or unfair or deceptive acts or practices in

6    violation of Rhode Island Gen. Laws. §6-13.1-1 *et seq.*

7    211.    Intel has engaged in unfair competition or unfair or deceptive acts or practices in

8    violation of South Carolina Code Laws §39-5-10 *et seq.*

9    212.    Intel has engaged in unfair competition or unfair or deceptive acts or practices in

10    violation of Utah Code §13-1-1 *et seq.*

11    213.    Intel has engaged in unfair competition or unfair or deceptive acts or practices in

12    violation of 9 Vermont §2451 *et seq.*

13    214.    Intel has engaged in unfair competition or unfair or deceptive acts or practices in

14    violation of West Virginia Code §46A-6-101 *et seq.*

15    215.    Intel has engaged in unfair competition or unfair or deceptive acts or practices in

16    violation of Wyoming Stat. §40-12-105.

17    216.    Class Members in the states listed above paid supra-competitive, artificially

18    inflated prices for x86 microprocessors. As a direct and proximate result of Intel's unlawful

19    conduct, Plaintiffs and the members of the Class have been injured in their business and property

20    in that they paid more for x86 microprocessors than they otherwise would have paid in the

21    absence of Intel's unlawful conduct.

22                                XV.    **SEVENTH CLAIM FOR RELIEF**

23                                **(Unjust Enrichment and Disgorgement of Profits)**

24    217.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every

25    allegation set forth in the preceding paragraphs of this Complaint.

26    218.    Intel has been unjustly enriched through overpayments by Plaintiffs and Class

27    members and the resulting profits.

28    219.    Under common law principles of unjust enrichment, Intel should not be permitted

-52-
CLASS ACTION COMPLAINT

1  to retain the benefits conferred via overpayments by Plaintiffs and Class members.

2      220.    Plaintiffs seek disgorgement of all profits resulting from such overpayments and

3  establishment of a constructive trust from which Plaintiffs and Class members may seek

4  restitution.

5                          **PRAYER FOR RELIEF**

6      WHEREFORE, Plaintiffs pray:

7      A.    That the Court determine that the Sherman Act, state antitrust law, and state

8  consumer protection and/or unfair competition law claims alleged herein may be maintained as a

9  class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure;

10      B.    That the conduct alleged herein be adjudged and decreed to be:

11          1.    Unlawful monopolization and an unlawful conspiracy to monopolize in

12              violation of Section 2 of the Sherman Act, and/or California common law,

13              as alleged in the First and Fourth Claims for Relief;

14          2.    Violation of the state antitrust laws identified in the Second and Fifth

15              Claims for Relief herein;

16          3.    Violations of the state consumer protection and unfair competition laws

17              identified in the Third and Sixth Claims for Relief herein;

18          4.    Acts of unjust enrichment as set forth in the Seventh Claim for Relief

19              herein.

20      C.    That Plaintiffs and the members of Class recover damages, as provided by federal

21  and state antitrust laws, and that a joint and several judgment in favor of Plaintiffs and the Class

22  be entered against Intel in an amount to be trebled in accordance with such laws;

23      D.    That Intel, its affiliates, successors, transferees, assignees, and the officers,

24  directors, partners, agents, and employees thereof, and all other persons acting or claiming to act

25  on their behalf, be permanently enjoined and restrained from in any manner engaging in the

26  unlawful conduct described herein.

27

28

-53-

1    E.    That Plaintiffs and members of the Class be awarded restitution, including

2  disgorgement of profits obtained by Intel as a result of their acts of unfair competition and acts of

3  unjust enrichment;

4    F.    That Plaintiffs and members of the Class be awarded punitive damages with

5  respect to their Fourth Cause of Action;

6    G.    That Plaintiffs and members of the Class be awarded pre- and post-judgment

7  interest, and that that interest be awarded at the highest legal rate from and after the date of

8  service of the initial complaint in this action;

9    H.    That Plaintiffs and members of the Class recover their costs of this suit, including

10  reasonable attorneys' fees as provided by law; and

11    I.    That Plaintiffs and members of the Class have such other, further, and different

12  relief as the case may require and the Court may deem just and proper under the circumstances.

13    **DEMAND FOR TRIAL BY JURY**

14    221.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand

15  a trial by jury for all issues so triable.

16

17  Dated: July 7, 2005                      Respectfully submitted,

18

19                                By:

20                                CRAIG C. CORBITT (No. 83251)
                                  JUDITH A. ZAHID (No. 215418)
                                  ZELLE, HOFMANN, VOELBEL,
21                                  MASON & GETTE LLP
                                  44 Montgomery Street, Suite 3400
22                                San Francisco, CA 94104
                                  Telephone:    (415) 693-0700
23                                Facsimile:    (415) 693-0770
                                  ccorbitt@zelle.com

24

25

26

27

28

-54-

1    MICHAEL P. LEHMANN (No. 77152)
     THE FURTH FIRM LLP
2    225 Bush Street, 15th Floor
     Telephone    (415) 433-2070
3    Facsimile:   (415) 982-2076

4    FRANCIS O. SCARPULLA (No. 41059)
     LAW OFFICES OF FRANCIS O.
5      SCARPULLA
     44 Montgomery Street, Suite 3400
6    San Francisco, California  94104
     Telephone    (415) 788-7210
7    Facsimile:   (415) 788-0707

8
     STEVEN BENZ
9    KELLOGG, HUBER, HANSEN, TODD,
       EVANS & FIGEL, P.L.L.C.
10   Sumner Square
     1615 M Street, NW, Suite 400
11   Washington, D.C.  20036
     Telephone:   (617) 371-1072
12   Facsimile:   (617) 371-1037

13   Attorneys for Plaintiffs

14

15   3159058v1

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT